## Iler, Appellant, *v.* Routh's Heirs.

It is well settled, that a bill of review can only be granted after an enrolment of the decree for error, apparent on the face of the decree; or upon some new matter, proved to have been since discovered. The new matter must not only be relevant, but distinct, and such as could not, upon reasonable diligence, have been previously discovered.

A bill of review will not be sustained merely to accumulate testimony to prove a fact which has before been in issue.

After an issue directed, as to the question of heirship, and verdict had, a party will not be allowed a bill of review to obtain witnesses to add to and strengthen his former proof.

But unless such bill be objected to below, it will be too late to raise the objection after an appeal.

The chancellor may, whenever his mind is in doubt or uncertainty as to the preponderance of evidence, send an issue to the country; but he has a right, with certain exceptions, to take upon himself the decision of every fact in the cause. And where the chancellor directed an issue to the country, in a case where the preponderance of evidence was clearly on one side, it was determined error would not lie, inasmuch as it was entirely a matter of discretion with the chancellor.

One heir may disseise his coheirs, and hold an adverse possession against them as well as a stranger; and, notwithstanding an entry as heir, the party may afterwards, by disseisin of his coheirs, acquire an exclusive possession, on which the statute of limitations will run.

Fraud, when relied on as an answer to the statute of limitations, cannot be presumed, but must be clearly proved.

Where A, pretending to be the legal representative of B, sold the land of the ancestor, in violation of the rights of the heir, and twenty years elapsed after the heir became of age, before he commenced his suit in equity for the recovery of the land, and the possession of the purchasers was accompanied with a multiplicity of acts demonstrative of a claim of exclusive ownership: *Held*, the right of the heir was clearly barred by the statute of limitations.

APPEAL from the Superior Court of Chancery.

The appellant filed his bill in the court below, to recover a

[Iler, Appellant, *v.* Routh's Heirs.]

tract of land in the county of Adams, as the heir of one Mark Iler, deceased.

The appellant claimed the tract of land mentioned in his bill as the sole surviving heir of the said Mark Iler, deceased. The bill states that the said Mark Iler, who is represented to be the ancestor of complainant, died in the year 1798. That he obtained the possession of the land in controversy, under a title derived from the Spanish government, and continued so possessed as the undisputed owner, until his death. The bill then charges that afterwards, and whilst the complainant was a minor, one Jonas Iler, since deceased, pretending to be the legal representative of said Mark Iler, sold the land to Job and Jeremiah Routh.

After the death of Mark Iler, a patent issued from the Spanish government, in the name of George Rowe, who was the first purchaser from that government, and under whom the said Mark Iler derived his title. That the Rouths obtained possession of this patent, and presented the same to the board of commissioners west of Pearl river, and obtained a confirmation of the Spanish title. The bill avers that, during this time the appellant was a minor and absent in Virginia; and that, within twenty years, he was ignorant of his rights; and that the appellees studiously avoided giving him any information; and that, as they had the possession of the title papers, complainant never would have become acquainted with his rights, but for mere accident. The appellant states that he knew of no other heir of the said Mark Iler.

The answer of Job Routh admits all the material facts of the bill except the statement that the complainant is the heir of Mark Iler. He also expressly denies that the evidences of title from the Spanish government were procured by fraud. He does not know at what time the complainant came to the knowledge of his rights, but believes that, at the time of the institution of the suit, he was more than forty years of age. The answer further states, that he has been in possession, without interruption, of said land, claiming it as his own against all the world since 1793, and relies in his defence on the statute of limitations. There were various depositions taken and read upon the trial, all of which were directed to the question of the heirship of the appel-

lant. On the second Monday of January, 1829, by an inter-
locutory decree of the court of chancery, an issue of fact was
directed to be made up, whether complainant was the son and
heir of Mark Iler; and on the 16th day of January, 1829, a ver-
dict was returned, by which the issue was found against the
appellant. A bill of review was afterwards filed, and additional
testimony taken to prove the heirship of the appellant. At the
April term of the court below, for the year 1832, a final decree
was rendered, dismissing the bill generally, from which this
appeal was taken.

Several witnesses testified to the marriage of Mark Iler with
Mrs. Hootsell, who was admitted to be the mother of the appel-
lant. The ceremony was performed at the military post of
Arkansas, by a person who testified that he was authorised by
the authorities at that place to solemnise marriage.

It was also proved, by one Crooks, that the marriage contract
was acknowledged by both parties. Katharine Kimball con-
firmed the statement of Crooks, related when, and at what house,
the marriage took place, and declared it was solemnised accord-
ing to law.

The birth of the appellant was also proved, and that Mark
Iler recognised him as his son.

It appeared that Mrs. Hootsell separated from Mark Iler, about
seven months after the birth of her son; that she subsequently
lived with one Fixton; and that the appellant, who lived with
his mother, was called Abraham Fixton.

Smith, for the appellant.

1. We insist that the legitimacy of Abram Iler, the complain-
ant, is clearly established by the evidence taken in the cause.
The testimony of Margaret Kimball alone, would be sufficient for
this purpose. It is direct and positive as to the fact of marriage;
the subsequent cohabitation of Mark Iler with the mother of
the complainant; the birth of the complainant within one year
after the marriage; and the acknowledgment of Mark Iler after
the birth of the complainant, that "he was his lawful child."

This testimony stands wholly unimpeached by the testimony
of any witness. No fact is noticed by any of the witnesses,

[Iler, Appellant, *v.* Routh's Heirs.]

directly repugnant to or irreconcilable with the perfect correctness of M. Kimball's statement. No fact is affirmatively and directly proved, which may not be true; and yet the testimony of M. Kimball be entirely so. The testimony of Christopher Miller and Susanna Smith, establishes facts which tend to show that a marriage did not take place; but even if they had directly and positively asserted that no marriage had been consummated, the credit which is to be given to the direct and affirmative testimony of Margaret Kimball, were there no evidence corroborative of her statements, would outweigh the opposing testimony. Swift's Ev. p. 145–6. The testimony of M. Kimball is powerfully sustained by the other proofs; by the evidence of J. Bradly and Margaret Williams. The evidence of these latter witnesses is sufficient to establish the legitimacy of the complainant. Courts, in cases similar to the one under discussion, will admit the declarations of deceased persons, who, from their situation, are likely to be cognisant of the facts. The statement of Margaret Bolton, afterwards Milurn, is, therefore, competent testimony. Buller, N. P. 294; Swift's Ev. The statement of the complainant's mother, made to Bradly, that the complainant was her legitimate son, by her marriage with Mark Iler, is evidence of both facts. The principle upon which statements of this character are admitted as evidence, is too well understood to require elucidation. As to the principle, authorities will be found in point in 1 East, 345; 7 East, 270. As to the question of the admissibility of the statement of the complainant's mother, touching her marriage and the legitimacy of his birth, as evidence in this cause; the opinion of Lord Mansfield in Cowper's Rep. 591, is conclusive.

We assume, then, that the heirship of the complainant is established; he is entitled to the property of his deceased ancestor, therefore, unless there has been a legal divestiture of his rights, or unless the facts, as established by the proofs in the cause, enable the respondent to interpose successfully the statute of limitations.

It will be necessary only to examine the latter branch of this proposition.

1. We think that the facts established by the bill, answer and proofs, show a state of the case not affected by the statute of limitations. It will be admitted, that if the facts established a trust of

[Iler, Appellant, *v.* Routh's Heirs.]

that character, " over which courts of common law take no. notice, and over which courts of equity have original, peculiar and exclusive jurisdiction;" the statutory bar can not be maintained. Mad. Chan. 359; 7 Johns. Chan. Rep. 111.

That the respondent stood in the relation of trustee at the time the legal title was vested in him, there can be no question. An equitable title vested in the complainant on the death of M. Iler, of which a court of common law could take no cognisance, and over which equity has "peculiar, original and exclusive jurisdiction." The title or interest of Jonas Iler, who was joint owner of the equitable estate, which had descended from their common ancestor, with Abram, having been, in 1793, transferred to the respondent, he became tenant in common with the complainant, holding under the equitable title of Mark Iler. And although he may have held possession of the whole property, yet, as he came into possession by a conveyance from one of the parties jointly interested, his possession cannot be considered as adverse, but must be held consistent with the right of the complainant; in other words, his possession was the possession of the complainant. 13 Johns. Rep. 115. Joint tenants are trustees for each other; and assuming that the conveyance from Jonas Iler to Routh, was sufficient to vest the equitable title held by him in J. Routh, in fee, but which we deny, the respondent, from the inception of his claim, stood as trustee for the complainant. Up to the time when the equitable title which Routh set up to the land was converted into a legal title, by the issuance of the patent from the United States, no remedy existed at law, by which, if possession had been wrongfully withheld by Routh, he could have sought redress. Nor could he, at any period since, have maintained an action at law for the recovery of possession. If no action at law could have been maintained by the complainant, it is difficult to conceive by what analogy to suits at law the statute of limitations could be applied. It is acknowledged that neither in this country nor in England does the statute of limitations apply in terms to proceedings in courts of equity; "yet equity takes the same limitations in cases that are analogous to those in which it applies at law." 10 Ves. Jun. 452. And where there is a concurrent remedy at law, equity will adopt the statutory

[Iler, Appellant, *v.* Routh's Heirs.]

bar which would apply in a suit at law for the same subject matter.

If, then, there existed no concurrent legal remedy—if the relation which existed and which still exists—was a trust of which a court of common law could not take notice, and over which equity has an original, exclusive and peculiar jurisdiction, it would appear that this case falls within the principle of those cases to which the statutory bar cannot be applied.

But if it should be held that the present is not a trust which is unaffected by the statute of limitations, we contend, that in consequence of the fraud practised by the respondent, by which we were kept in ignorance of our rights, the statute did not run for a length of time sufficient, anterior to the commencement of our suit, to bar a recovery.

The allegation of the bill, that the respondent fraudulently and studiously concealed from the complainant his right, is not denied. The allegation is, therefore, to be taken as true. If then, the facts established amount to a fraud in law upon the rights of the complainant; if the respondent, by an unauthorised use of the title papers of the complainant, procured the legal title in his own name, the statute only commenced to run from the discovery of our rights, and in this case constitutes no bar.

It will be observed that the facts charged in the bill, are admitted in the answer, with a general denial of the fraud. But if the facts charged and admitted in the answer constitute *per se* a fraud in law, the denial of fraud must be held for nothing. We think we can show, most conclusively, that a gross fraud was committed by the respondent upon the rights of the complainant.

The instrument, by which the sale of the land from Jonas Iler to respondent, is evidenced, vests in him but a life-estate for his own life; and only so far as Jonas Iler's interest is concerned. Upon the death of Routh, Jonas Iler, or his heirs, in case of his death, would have been entitled to the reversion—the complainant being the heir of Jonas Iler was entitled to it. Routh knew that he was entitled to but a life-estate in the land, and it matters not, therefore, whether he knew of the existence of Abram Iler or not. But we are not left to conjecture on this subject; for,

24*

about the time when the land was confirmed to Routh by the commissioners, we find that he recognises Abram Iler as the heir of Jonas. What then is the case? Routh purchases a life-estate in the land of Jonas Iler, and takes possession of the land belonging as well to Abram as to Jonas Iler. Jonas leaves the country, and is lost at sea. Abram is a minor, helpless, and ignorant of his rights. Routh obtained from the various individuals, who had been at different times the owners of this land, their evidences of title; he procured from Mr. Coleman, an assignment of the patent, which had issued in the name of Row. With these evidences of title, he ultimately obtained from the board of commissioners, a certificate confirming the land to him in his own name in fee; and by which act he knew he was defeating the inheritance, and destroying the reversionary interest of unprotected orphans, or persons absent, or ignorant of their rights.

These acts come clearly within the definitions of fraud. Judge Story, in his most excellent treatise on equity, defines fraud to be " in the sense of a court of equity—all acts, omissions, and concealments—which involve a breach of legal or equitable duty." 2 Story's Com. Eq. 127; as to undue concealment, in same, 236.

If there was a fraud practised by Routh, in obtaining a patent for the land from the United States, in his own name, and the complainant, in consequence of this fraud, was kept in ignorance of his rights, the statute did not commence running, until a discovery. This doctrine has been held, even in courts of law, where the statute of limitations has been attempted to be set up, in order to evade the consequences of a fraudulent act. Bree *v.* Holbech, Douglas, 654; 3 Mass. Rep. 201. In the first of these cases, the decision was made by Lord Mansfield; in the second, by Judge Parsons. The propriety of these decisions, at law, has been doubted; but, as to the correctness of this position applied to proceedings in a court of equity, there can be no doubt. In the celebrated case of Hoveden *v.* Lord Annesley, decided by Lord Chancellor Redesdale, it is clearly recognised, and most emphatically stated.

The learned chancellor says, " that pending the concealment of a fraud, the statute of limitations ought not, in conscience, to run; the conscience of the party being so affected, that he ought not to

[Iler, Appellant, *v.* Routh's Heirs.]

be allowed to avail himself of the length of time. 2 Schoale &
Lefroy, 634; 4 Dessaussure's Eq. Rep. 475; Troup *v.* Smith, 20
Johns. Rep. 47; Brown *v.* Lynch, 1 Paige, 158.

We insist, also, that the respondent cannot avail himself of any
statute bar, because he has not pleaded any statute, nor does he
state in his answer, upon what statute of limitations he rests his
defence. It will not be denied, that, if the party had pleaded the
statute of six years, or had relied in his answer on the same,
the court would not notice any attempt to interpose any other
statute, say, for instance, the 20 years' statute, applied to actions
of ejectment. The court will not search the statute book to find
a statutory bar, which will correspond with the respondent's
proofs. He should have known what his defence was, and should
have presented it in a tangible shape for the consideration of the
court.

And we insist, that, if any statute can be recognised by the
court, as applicable under the state of pleadings, it must be the
statute which provides that fifty years' actual and uninterrupted
possession shall confer a perfect title in fee.

If it should be insisted, that it is not now competent for this court
to inquire into the merits of the case, as presented by the whole
record, but only into the questions which have supervened upon
granting the bill of review—we answer this anticipated objection
thus: The bill of review, as it is called in this case, is simply a
petition for a rehearing or re-argument; and must have been so
regarded by the chancellor and the opposing counsel. In confir-
mation of this impression, it will be observed, that there was, at
the time of the filing of the petition, no decree of the chancellor
enrolled and signed; that a review would not have been granted
in that state of the case; and that, if this proceeding had been
regarded in the nature of a bill of review, the complainant would
have been met at the threshold with a demurrer. But, admitting
that it was a bill of review, we contend, that the respondent is
precluded from objecting to the propriety of granting the review,
as he has virtually consented to a re-argument and rehearing of
the cause, by failing to answer, or demur to the bill of review, or
to object in any other way. And as no exception was taken to
the re-opening the cause, it matters not whether a bill of review,

[Iler, Appellant, *v.* Routh's Heirs.]

or not, could in strict propriety have been allowed. The case was fully opened, testimony was adduced on both sides; it was argued upon the merits of the whole cause, and decided upon the merits. It is from this decree, on the merits of the whole cause that we have appealed; the whole record is before the court, and our appeal extends to all errors which may have intervened from the commencement of the suit to its termination in the chancery court.

M'Murran, for the appellees.

The first question presented to the consideration of the court is, whether the chancellor ought to have reviewed the original decree at all? We contend, that he ought not, as he did not. An issue had been directed, upon the final hearing of the cause, as to the legitimacy or heirship of complainant, Abram Iler; it was tried, and found against him; a motion made for a new trial and overruled, and then a final decree pronounced against him. Upon the hearing of the bill of review, the chancery court came to the same conclusion again, and dismissed the case. Was that court right in doing so? Will the court, upon the weight of the additional evidence adduced upon the hearing, and upon principles governing courts of equity, in such cases, review at all the original decree? All the testimony taken is merely cumulative, on the side of complainant to prove heirship, and on the part of defendant to disprove it; and no bill of review is ever sustained on such grounds. Bills of review are granted only for some newly discovered distinct matter, which ordinary diligence could not discover before; or for error apparent on the face of the decree. The latter is not pretended, and the former does not exist. What testimony was taken under the bill of review, was entirely cumulative, and nothing at all to show any diligence to obtain it on first hearing, or that it was discovered since the original decree was rendered. In support of these positions, I refer to the authorities cited. Blake's Chan. 54, 55; Todd *v.* Barlow, 2 Johns. Chan. Rep. 551–553; 1 Johns. Cas. 492–494, and cases there cited.

But if the court should determine to re-examine the whole case, we insist the result would be the same upon a similar issue, and

[Iler, Appellant, *v.* Routh's Heirs.]

consequently, the decision of this court will be the same as that of the court below.   There was fully as much testimony added under the bill of review on the part of Routh, as of Iler, as the depositions show.   Great reliance was placed on the testimony of Mrs. Kimball.   It was taken on the first hearing as well as the second, but much stretched in her last deposition.   She swears to the particulars of a marriage, and birth of a child, which she says, took place when she was twelve or thirteen years of age, at the Post of Arkansas; and when her first deposition was taken, in 1828, she says the marriage was about forty years before.   That would make it in 1788, when, according to all the other testimony, Mark Iler was in Adams county, near Natchez.   Moreover, she says, that when her second deposition was taken in 1830, she was then about fifty years of age; that would make her born in about 1780, and Abram Iler was born between 1780 and 1785, about 1782; so that, according to her own account, she was about two years old at Abram's birth!   She, too, is the only one who pretends to have witnessed the marriage, all the others, at the Post of Arkansas at the time, contradict the idea that there was any thing of a marriage, and most of them were of an age to know and to recollect.   Besides, the witness, Mrs. Kimball, is incompetent; she is interested in establishing the marriage of Mark Iler and her mother, as she would be entitled, as the heir of her mother, to a portion of the property sought to be recovered; her mother, under the Spanish laws then prevailing, if married, would be entitled to half, which, on her death, would descend to her children.   But review all the testimony taken in the cause since the original hearing, and the result must be the same as to the legitimacy and heirship of Abram Huxton, alias Iler.   He was called Abram after his father, Abram Huxton, or Fixton.   The Spanish proceedings, too, show he was not the heir of Mark Iler.

But let us admit, solely, however, for the sake of argument, that he was a legitimate son of Mark Iler.   What difference can it make in the decision of this cause?   If Mark Iler ever had any claim to the property sought to be recovered by appellant, it was upon a conveyance to him, based upon nothing but an order of survey from the Spanish authorities, though there is no legal evi-

dence of that before the court.   The Spanish grant to Routh, did not issue till 1795, six years after Mark Iler's death, and the grant was assigned directly to Job and Jeremiah Routh, for a valuable consideration, by Mrs. Coleman, the representative of Row, with the approbation of Row's son.   And, in 1804, the certificate of confirmation issued to Jeremiah and Job Routh, in their own right, based upon the documents and proofs which they laid, in their own rights, before the board of commissioners.   According to the acts of congress, passed in furtherance of the articles of agreement and cession, and the opinion of the Supreme Court, in the causes cited, the Spanish government had conveyed no title, legal or equitable, to the vendor of Mark Iler.   The acts of congress, by its bounty alone, gave the title: and to whom?   To the person who, under the acts of congress upon this subject, received the certificate of confirmation.   Rev. Code, 502, 505, 506; Poindexter's Adm'r. *v.* Henderson, 12 Wheat. 530.

There is no fraud in this case, no connection at all between complainant and defendant; no pretence of unfairness on the part of Job or Jeremiah Routh, in purchasing the property and paying for it twice.   It was done in open day, from the only and universally acknowledged heir in those days, and recognised as such by the Spanish authority.   2 Caines' Rep. 182–185.

Again.   The transcript of the proceedings under the Spanish government, in the first place, establishing Jonas or John Iler, (Jonas, or John being derived from the same Spanish word,) the universal heir of Mark Iler, and then the proceeding of Alexander Moore against that universal heir to recover a debt due by the ancestor, and selling the lands claimed by complainant to meet the debt to Moore, and he becoming the purchaser.   These proceedings, which are competent evidence in translations, show clearly that the title, as far as there was any under the Spanish survey, vested in Jonas Iler, or if not in him, in Alexander Moore. Goods or chattels under the civil law, include real estate according to Domat.   Turner's Dig 492–495; 1 Domat's Civ. Law, 169.

A deed, too, could be presumed, and is presumed in such cases. These Spanish proceedings took place in 1783, between forty and fifty years since. 1 Cowper's Rep. 119–31, 217.   A deed will be presumed in favor of Job Routh, who has been so long in possession,

[Iler, Appellant, *v.* Routh's Heirs.]

consistently with such a deed.  But independently of this view of the case, there is shown by these proceedings, and the record, an outstanding title in Alexander Moore, the purchaser at the sale, to satisfy the debt due him, and this is available equally in a court of equity, and in a court of law.  In either court, the plaintiff must recover upon the strength of his own title, and not upon the weakness of his adversary's.  7 Wheat. Rep. 158, 161; Hardin's Rep. 101, 3.  If the appellant has not shown a title in himself paramount to all others, he cannot recover; the decision must be against him.  These principles apply, too, with peculiar force in this case, when we reflect upon the long and undisputed possession of Mr. Routh, of the property in controversy; and upon which long and undisputed possession, he confidently relies for an affirmance of the decree of the chancellor, independently of all other considerations.

Upon common law principles, as well as under our statute, the appellant is completely barred by time.  The depositions of all the witnesses, entitled to any credence, on both sides, show the defendant to be, at least, forty-five years of age, when suit was brought.  Examine the depositions of all who testify as to Abram Iler's age, especially, Israel Leonard, John Minor, William Adams, Mrs. Smith, James Bradley, Henry Phipps, and Christopher Miller, and appellant's birth must be fixed at 1782.  The same witnesses, and all the testimony in the record will show, that Job Routh was in the continued possession of the property, from 1793, at least till the day of his death, two or three years since; holding it thus adversely to all the world, exercising every act of ownership over it, putting large improvements upon it in his own right, for, at least, thirty-four or thirty-five years before the institution of this suit.  There is then, clearly, an adverse, uninterrupted possession on the part of Job Routh, with a title believed to be a good one, at least, twenty-four years after Abram Iler arrived at age, and before he commenced the suit.  Rev. Code, 183, sect. 1; Ang. on Lim. 339, 347; 2 Scho. & Lef. 607, 624, 636; 6 Peters' Cond. Rep. 47–55; Elmendorf *v.* Taylor, 10 Wheat. Rep. 152; Henry Miller's Heirs *v.* M'Intyre, &c., 6 Peters' Rep. 61.

Buckner, on the same side.

The case is now before the court, on the bill of review.  If

[Iler, Appellant, v. Routh's Heirs.]

then the matter offered in support of that bill is not such as, upon settled principles of law, would induce the court to review the former decree, there is an end of the case. It will be seen that there is nothing, but additional cumulative testimony taken under this bill of review, and that, too, directed to the only controverted fact (the heirship) in the case. A bill of review never was sustained upon such grounds. They are granted only for some newly discovered distinct matter, which ordinary diligence could not have discovered before, or for some error apparent on the face of the record. See 1 Harden, 342, 451; Mitf. Plead. 128; 3 Marsh. 121; 3 Johns. Cha. Rep. 124, 129; 2 Hen. and Munf. 525; 2 Mad. Chan. 382, 281, 289, 300, 541; Pirt. Dig. 258; Mitf. Plead. 134.

2. The defendant's ancestor (Job Routh) was a fair *bona fide* purchaser for valuable consideration, without notice, and had been quietly enjoying the premises in question, adversely to complainants' claim, for the period of about thirty-four years previous to the institution of this suit, and according to the testimony, some twenty-five years after the complainant (Abram Iler) became of age; which lapse of time we insist upon as a complete bar to the complainant's bill. See Rev. Code, 193, sect. 1; 10 Wheaton, 152, 168, 175; 2 Harris & Johns. 414; 2 Jac. and Walker, 192, 151; 9 Cowen, 530; strong case in defendant's favor; Angell, Lim. 340, 1, 2, 3, 4, 5, 6, inclusive.

3. But the magic notion of a trust has been started up by the opposite counsel, to relieve against the statute of limitations. The startling position is assumed, that (Job Routh) a *bona fide* purchaser without notice and after an adverse possession of thirty years, is, by the act of a court of equity, to be suddenly transformed into a trustee, and be foreclosed from all the benefit which the lapse of time, connected with adverse possession, could give! And this too, when Routh, having purchased Jonas Iler's part, would at least be a tenant in common with complainant Abram Iler, the pretended brother of Jonas. But no such trust can be raised here, as would bar the statute. See Ang. on Lim. 92, 97, 98, 132, 133, 134, 135.

4. The defendants here have an equal equity with the complainants, and have also the legal title, and it is a well settled

principle, that a court of chancery interferes in favor of a prior equity, against a junior perfect title, upon the principle alone, that the junior purchaser bought with notice of the prior equitable claim, which is not pretended to be true in relation to Routh. See 5 Cranch, 223.

5. The complainant's claim is based upon a Spanish order of survey, or a grant, and was never confirmed to them or those under whom they claim by any act of the government of the United States. They consequently have no title either legal or equitable, either by the acts of congress or the decisions of the Supreme Court of the United States, and there is no saving in the acts of congress in favor of infants having Spanish claims. See Rev. Code, 502, 505, 506; Poindexter's Lessee *v.* Henderson, 12 Wheaton, 540.

6. The statute of limitations applies to this case in a double aspect: 1. as to the adverse possession; and 2. as to the conveyance asked as a remedy. It is virtually a bill for the specific performance of an executory contract. Are the rules which govern the action of courts of equity in cases for specific performance, such as would warrant the relief asked in this case? The court is here called upon for the first time after the lapse of thirty-four years to enforce an executory contract, and to create a legal title out of a most suspicious, and doubtful equitable claim. And by whom, and against whom is this extraordinary proceeding asked? By one, to say the least of it, of doubtful legitimacy, who has slept upon his rights for twenty-five or thirty years, and against an honest possessor and *bona fide* purchaser, without notice. See 1 Johns. Chan. Rep. 300.

When courts will enforce a specific performance, and when not. Not, where there has been a change of circumstances. Not, after great length of time. The claim must be fair, reasonable, and equal in all its parts.

7. The question of heirship.

Will the court consider it necessary to again direct an issue on this question, and that too (as will be perceived from an examination of the additional testimony taken under the bill of review) when the case stands in the same aspect in relation to the proofs, as it did when the former issue was tried; or rather since

the aspect of the case has not been changed by the additional testimony taken on both sides, (except to strengthen it for the defendants?) Will not the court take the verdict of the jury upon the issue tried, as showing the court how this disputed matter of fact is to be decided?

Winchester, for the appellant, in reply.

1. The facts of the marriage of Mark Iler and Mrs. Hootsel in 1781 or 1782, and of the birth of Abram Iler, are established by the positive proof of Katharine Kimball, who was present at the marriage and birth. She is a competent witness, her credibility as a witness is not attempted to be impeached, there is no contradiction in her testimony, and not only the main facts of the marriage and birth, but every other fact stated by her, is corroborated and proved by nearly all of the other witnesses and exhibits in the cause, so that, if her evidence were entirely stricken out of the case, these facts would still remain proved positively and directly, by as full evidence as the law ever requires.

There is no evidence in the cause, which contradicts these proofs or which are at all inconsistent with them.

The chancellor, therefore, ought not to have directed an issue to the jury, and the verdict of the jury is of no weight against the proofs.

No marriage or birth, in or out of Arkansas, west of the Alleghany mountains, at as early a period as 1782, can be proved with as much certainty as this. Story's Conflict of Laws, 100; Swift's Ev. 506; Gilbert's Ev. 1088; 4 Bacon, 529.

Spiritual courts have the sole and exclusive cognisance of the legality of a marriage in a suit directly on the question. Blackman's Case, 11 State Trials, 281. Trespass for adultery is the only civil case, where it is necessary to prove an actual marriage.

Hearsay and reputation are admissible evidence; and so also the declarations of deceased persons, entries in a family bible, inscriptions on a tomb stone, a statement in a bill in chancery, and *a fortiori* of the *ex parte* depositions of witnesses, whose declarations would be good, have always been held sufficient, in all civil suits, where pedigree or heirship was in question.

That Abram Iler was the lawful heir of Mark Iler, therefore, is incontestably established.

[Iler, Appellant, *v.* Routh's Heirs.]

2. As a co-heir with Jonas Iler, Abram Iler was entitled to one half of whatever right Mark Iler had in the land in controversy at the time of his death, and also of the other half upon the death of Jonas Iler, he having conveyed his right to the Rouths for life only.

3. This right of Abram Iler, was the right of an heir claiming by descent the benefit, or bounty if you please, of the acts of the general government confirming the equitable title to the land, which the answer of Routh admits was in Mark Iler at the time of his death, and under which Routh had the title confirmed in his own name, and under which alone Routh in his answer still claims the tenure and possession of the land.

To the recovery of this right by the present remedy, the defendant in his answer says, he relies on the statute of limitations. To which we answer,

1. That the statute must be pleaded or insisted upon in the answer, and neither is done in such manner as that the court can notice it.   3 Johns. Cha. Rep. 384; 7 Johns. Cha. Rep. 134.

2. That the right by descent which plaintiff here seeks to enforce, was a direct, and express trust in Routh, and purely the creature of a court of equity, for which complainant never had a remedy at law, but only in equity, and is such a trust as is never barred by the statute of limitations.   10 Wheaton, 176; 7 Johns. Cha. Rep. 110 to 126.

3. That if not a trust of the above nature, it is an equitable title, against which the defendant has never held adversely, but on the contrary under it, and now sets it up as his sole title in the answer.   7 Johns. Cha. Rep. 127; 10 Wheaton, 168, 176; 9 Cowen.

4. That if defendant ever has held adversely, it has been in fraud of the rights of Abram Iler, which fraud was kept concealed, and said Iler kept studiously in ignorance of his rights, until within twenty years, and therefore the statute is no bar. 7 Johns. Cha. Rep. 122.

Each of the above four is a full answer to the statute.

A purchaser for a valuable consideration, if he wishes to avail himself of the want of notice, must positively deny all notice, though it be not charged.   6 Johns. Cha. Rep. 398, 403; 3 Johns.

[Iler, Appellant, *v.* Routh's Heirs.]

Cha. Rep. 345; Prec. in Chan. 226; 2 P. Wms. 491; 2 Johns. Cha. Rep. 566; 3 P. Wms. 244, *n.*; 1 Vernon, 179.

Chancery has original jurisdiction, to be exercised in sound discretion, to try all questions of fact, without the aid of a jury, 5 Johns. Cha. Rep. 118; 1 Johns. Cases; and it is not bound, except in cases of bills for divorce, for adultery, or where there is an issue of *devisavit vel non*, to send a matter of fact to be tried by a jury, if it can decide of itself, to its own satisfaction on the evidence. *Ibid.*

That the plaintiff is a *bona fide* purchaser without notice, is not ground for a bill for relief, though it is a good ground of defence. 18 Johns. Cha. Rep. 543.

Mr. Justice Trotter delivered the opinion of the court.

Several questions have been presented for the determination of this court on this statement of the case. The first is, whether the court below had any authority to allow the bill of review on the grounds stated in the application to the court for that purpose. The rule on this subject is well settled. A bill of review can only be granted after an enrolment of the decree, for error apparent on the face of the decree, or upon some new matter ,as a release, receipt, &c., proved to have been discovered since. 2 Mad. Chan. 536; Taylor *v.* Sharp, 3 Peere Williams, 371; 3 Atkyns, 35. In the case of Wiser *v.* Blachley, 2 Johns. Chan. Rep. 490, this rule is stated as the ground for dismissing the petition for a rehearing. In the case of Livingston *v.* Hubbs, 3 Johns. Chan. Rep. 126, the same rule is recognised and applied. The newly discovered matter, for which the decree is sought to be reviewed, must not be relevant only; it must be distinct, and such as could not, upon reasonable diligence, have been ascertained. In the case last cited, the ground of the decree was, that certain land had been represented to the complainant to be of good quality, and fit for cultivation, when in fact it was not. Whether the land was so represented, and so defective, was the main question in the cause, and the newly discovered evidence was such as had a tendency to decide that issue. The petition for the bill of review stated that, since the decree, the defen-

[Iler, Appellant, *v.* Routh's Heirs.]

dant had discovered that several of the witnesses had mistaken the land in question, and had testified respecting lands adjoining thereto. · That since the decree he had procured the tract in question to be surveyed, and that several intelligent persons had since visited it, and declared it to be as he had represented it. The chancellor refused the application. He said the defendant's attention was called to the very fact, by the issue submitted under the pleadings, and he was bound to use reasonable diligence in bringing forward his proof on that point. A bill of review is not to be sustained merely to accumulate testimony. The nature of the newly discovered evidence must be different from that of mere accumulation of witnesses to a litigated fact. This is the rule in the analogous case of an application for a new trial at law, and it is one which is never departed from. It is a sound and salutary one, designed to restrain litigation, avoid perjury, and give stability to the tenure of property. The case before us, is very similar in its features to that of Respass *v.* M'Clanahan, Hardin's Rep. 342. In that case, the court lay down the rule as it has already been stated, and proceed to say, that after the most diligent search, they could not find one case reported, in which a bill of review has been allowed on the discovery of new witnesses, to prove a fact which had before been in issue. If the rule were otherwise, it might, as was observed by the chancellor in the case of Taylor *v.* Sharp, 3 Peere Williams, 371, be used for vexation and oppression, and the cause never be at rest. Or, as remarked by the court in the case of Respass *v.* M'Clanahan, the dangers and mischiefs to society are too great to be endured, if, whenever a new witness can honestly, or by subornation, be found, whose testimony may probably change a decree in chancery, a bill of review is allowed. If such a rule were allowed, when would there be an end of litigation? The ground of the decree in the present case, was the verdict of the jury upon the issue, whether the complainant was the heir of Mark Iler. The fact of his heirship was expressly charged by the complainant in his bill, as the foundation of his title to the land in dispute, and it was expressly denied in the answer of the defendant. The attention of the complainant was, therefore, necessarily called to it, and he was bound to use due diligence in bringing forward his

[Iler, Appellant, *v.* Routh's Heirs.]

proof. This was an important point in his case; for if found against him, it must be fatal to his cause. He was bound to bring forward all the testimony in his power, and cannot be permitted to experiment upon the sufficiency of the evidence produced, and when that is found too weak, have permission to mend his hold, and add to the force or number of his witnesses. Yet this was the case in the present instance. After the issue has been found against him, on the proof which he thought proper to adduce, he asks a bill of review, not for any error apparent on the face of the decree, nor for any new and distinct matter, but to obtain the testimony of other witnesses to add to and strengthen his former proof. He refers to several witnesses who will make stronger and fuller proof of his heirship. This was, therefore, cumulative testimony merely, and was not proper ground for a bill of review. No objection was, however, made to the granting of the bill in the court below, no demurrer filed, nor any question in any form made upon it, and it is too late to urge the objection after an appeal to this court. In this case the appellees gave it at least an implied sanction by taking depositions, and going to trial afterwards before the chancellor. If the question were properly before us, we should have no hesitation in dismissing the bill; but it is a general rule, founded in much reason and great convenience, that no objection can be made in the court of errors which was not taken in the court below.

The second question for our consideration is, whether the complainant did establish the fact of his heirship as charged in his bill. This is purely a question of fact to be decided upon the proofs in the cause. The fact was once determined, by a jury, against the complainant. But it is insisted that the chancellor erred in directing an issue to the jury, because the proof was all on one side, and in favor of the complainant. It is, however, a general rule fully sustained by authority, that the chancellor may, whenever his mind is thrown into a state of doubt and uncertainty as to the preponderance of evidence, send an issue to the country; but he has a right, with certain exceptions, to take upon himself the decision of every question of fact in the cause; and this rests in his sound discretion. 2 Mad. Chan. 474. We are certainly of opinion that the weight of the evidence was clearly

for the complainant on this issue, and that the chancellor might, with great propriety, have so determined. But as he has seen proper to take the verdict of the jury, we are not at liberty to pronounce it error. It was a matter of discretion with the chancellor, and we can have no farther concern with it than to consider of its effects upon this question in the cause. The mind of the chancellor concurred with the opinion of the jury; and we might feel inclined to attach much weight to this determination, if it had not been subsequently opened by granting the bill of review. We are, therefore, constrained to consider this question unconnected with the verdict, and uninfluenced by it. The whole weight of the evidence is manifestly for the complainant. Several witnesses have sworn positively and affirmatively to the fact of the marriage of Mark Iler to Mrs. Hootsell, who is admitted to be the mother of the appellant. The ceremony of marriage was performed at the post of Arkansas, and by a person who swears that he was authorised by the authorities at that place to do so. We are not informed what was the law on this subject at the place where the marriage took place. It was a military post, with but few persons, in a remote wilderness. There was no regularly established form of government; and was probably governed by the usages of the mother country, so far as they could apply. What they were, is, however, totally immaterial. It is clear from the whole testimony, that there was a contract of marriage between Mrs. Hootsell and the complainant's father, and that it was formally and solemnly acknowledged and avowed by both parties, as proved by the deposition of William Crooks. He testifies that they were lawfully married, and refers to the year when it occurred. Katharine Kimball also swears positively and affirmatively to the fact of the marriage, and confirms the statement of Crooks. She states the house where the ceremony was performed, by whom, and who were present. She says the marriage was celebrated according to law, and is particular in mentioning the presence of Mrs. Bolton. She also proves the birth of the complainant, about eleven months after this marriage, and that Mark Iler recognised him as his son. These statements are confirmed by the testimony of several of the witnesses, who speak of the general

[Iler, Appellant, *v.* Routh's Heirs.]

reputation which prevailed, that Abram Iler, the appellant, was the son of Mark Iler. It is true that several witnesses proved that the complainant was called by the name of Fixton. But this testimony is easily reconciled with the evidence of Mrs. Kimball, when it is recollected that Mark Iler separated from the widow Hootsell, after living with her about seven months, and that she afterwards lived with a man of the name of Fixton. The complainant being then an infant, was, of course, taken by his mother, and would very naturally be called by the name of his mother's husband. This may readily account for the confusion of names by which he was known. But this negative evidence can never be permitted to control the direct and affirmative testimony of the other witnesses. We are, therefore, of opinion that it is clearly established by the testimony in this cause, that the complainant is the heir at law of Mark Iler. He is, therefore, entitled to recover the land in controversy, unless his claim has been barred by the length of time which elapsed after he attained the age of twenty-one before the institution of this suit, and that is the third and last point of inquiry.

In the case of Smith *v.* Clay, Ambler, 645, the rule is laid down by Lord Camden to be, that, as often as parliament had limited the time of actions and remedies to a certain period, in legal proceedings, the court of chancery adopted that rule, and applied it to similar cases in equity. In the case of Elmendorf *v.* Taylor *et al.*, 10 Wheat. 152, it is said, that, from the earliest ages, courts of equity have refused their aid to those who have neglected for an unreasonable length of time, to assert their claims, especially where the legal estate has been transferred to purchasers without notice. The same doctrine is stated and applied in the case of Clapp *v.* Bromagham, 9 Cowen, 530. Courts of equity have, therefore, uniformly adopted the limitation which is prescribed in the analogous proceeding at law. For, although the act of limitations does not extend to them in terms, yet they have always acknowledged the obligation of them. By the provisions of the first section of the act for the limitation of actions, every real, possessory, ancestral, mixed, or other action for any lands, tenements, or hereditaments, shall be brought and instituted within twenty years next after the right or title thereto, or cause

of such action accrued, and not after, &c.    A proviso is then added in favor of infants, &c.    If more than twenty years had elapsed after the appellant attained the age of twenty-one years, before the commencement of this suit, his remedy is, therefore, clearly barred by this statute.    The bill of complaint, in this case, was filed in January, 1827, at which time, according to the evidence, the complainant was upwards of forty years of age, and when, according to the admissions of the parties, he had been of age more than twenty years.    But it is insisted by the appellant, that the defendants are not entitled to the benefit of the bar prescribed by the statute, because they are tenants in common with the complainant.    The entry upon the land by Jonas Iler, one of the heirs of Mark Iler, deceased, and under whom the defendants claim title, was as heir of Mark Iler, it is said, and his entry and possession were not adverse to, but in consonance with the rights of Abram Iler, the other heir.    It is unquestionably true, that in general, the entry of one heir will inure to the benefit of all, and that if the entry is made as heir without claim of an exclusive title, it will be deemed an entry not adverse to, but in consonance with the rights of the other heirs.    But it is as clear that one heir may disseise his co-heirs, and hold an adverse possession against them, as well as a stranger, and notwithstanding an entry as heir, the party may afterwards, by disseisin of his co-heirs, acquire exclusive possession, on which the statute will run.    Such was the determination of the Supreme Court of the United States in the case of Ricard *v.* Williams, 7 Wheat. 59.    It is true in that case, the court say, that ouster or disseisin is not to be presumed from the mere fact of sole possession, but that it may be proved by such possession, accompanied with a notorious claim of an exclusive right.    In the case before us, Jonas Iler took possession of the land in dispute upon his father's death, and we have the strongest evidence of his claim of an exclusive right as heir at law from the fact of the sale made by him shortly afterwards, to Job and Jeremiah Routh, and taking to himself the whole of the purchase money.    The Rouths paid Jonas Iler six hundred dollars for the land.    This was in 1793.    And it is very evident that no matter what relation Jonas Iler may have occupied towards Abram, anterior to this transfer, from this time that relation

ceased, and there was a disseisin.   No force or violence is neces-
sary to constitute an ouster.   Any act of one joint tenant which
is evidence of a claim of exclusive ownership, such as taking all
the rents and profits to himself will constitute a disseisin.   But
how can it be said, that the subsequent possession of the Rouths
was in consonance with the rights of Abram Iler?   Is there any
thing in their conduct which recognises his rights?   On the con-
trary, is not their possession accompanied by a multiplicity of
acts, all demonstrative of a claim of exclusive ownership?   Short-
ly after the purchase from Jonas Iler, they procured from the
representatives of Row the patent which had issued in his name
from the Spanish government, and also obtained from his widow
and executrix, a conveyance of the legal title to the land to them-
selves.   And afterwards, on the 2d day of October, 1805, obtained
from the board of commissioners, west of Pearl river, a certificate
of the confirmation of their grant.   In all these steps, no notice is
taken by them of Abram Iler, nor any recognition of his rights.
On the contrary, these proceedings do assert in so many words,
an exclusive right in the Rouths.   How then can it be insisted,
that the possession of the Rouths in this case was not adverse to
the rights of Abram Iler?   This case is precisely the same in
principle with that of Clapp *v.* Bromagham, 9 Cowen, 550.   In
that case, it is stated, that the ancestor under whom the petition-
ers claimed title to the land in dispute, died a lunatic, and that he
was seised of the premises in fee.   That he had nine children at
his death, amongst whom were the petitioners, and Peter and
Isaac Bromagham.   After the ancestor became a lunatic, and
about four years before his death, Peter and Isaac, by the com-
mon consent of the family, took the possession and management
of the farm; that Peter was afterwards appointed by the court of
chancery, the committee of the person and the estate of the luna-
tic; that Peter purchased the share of Isaac in the premises, after
which, he had the sole possession of the whole of the land at the
time of the death of the lunatic, and claimed to be the absolute,
and exclusive owner of the same; that he continued to hold the
same as his own adversely to all other persons, until he sold and
conveyed the same to John Clapp, the plaintiff in error, who con-
tinued in possession, as the sole and absolute owner for more

[Iler, Appellant, *v.* Routh's Heirs.]

than twenty years.   Upon this statement of the facts, Clapp, in answer to the claim of the petitioners for partition of the land insisted upon the statute of limitations of twenty years as a bar; and it was argued by the petitioners, that the parties stood in the relation of tenants in common to each other, and that the possession of one of them was in judgment of law, the possession of all of them.   It was said, as it has been in the case before us, that the title of the defendant was derived from the same source with that claimed by the petitioners, and that under the title derived from Peter, the defendant entered as tenant in common with the petitioners.   But the chancellor said there was no color for these suggestions.   On the contrary, Clapp entered as purchaser of the whole, his title was adverse to the petitioners, he never held in common with them, nor acknowledged any right in them. How then, asks the chancellor, could that seisin and possession inure to the benefit of the petitioners?   If the possession of the defendant in that case was deemed adverse, the possession of the Rouths in the present case is equally so.   The two cases are identical in principle.   According to the modern and approved interpretation of an adverse possession, it is held to embrace every possession held by the possessor in exclusion of others.   In the present case, Jonas Iler took possession of the land upon the death of his father, and continued in possession as sole owner, and claiming the whole, until he conveyed the land to the ancestors of the appellees.   That conveyance was most clearly the exertion of an act of ownership, inconsistent with the rights of others, and was virtually an ouster.   The subsequent possession of the Rouths, was manifestly adverse to the complainant.   The sale by Jonas Iler, was perfectly decisive of the character of his entry, and the exclusive nature of his possession.   Though it be true that the entry of one tenant in common is the entry of both, yet, if one enter, claiming the whole, this will be an entry adverse to his companion.   14 Viner, 512   These principles are deemed decisive of the present case.   Jonas Iler claimed the whole estate, and sold it to the appellees, who have held it adversely to all the world, for nearly thirty-five years, keeping all others, during that time, out of possession.   This is, therefore, considered by us to be a clear case for the application of the statute of limitations.   But it

[Iler, Appellant, *v.* Routh's Heirs.]

is contended, that the statute does not bar the appellant's claim in this case, because the Rouths obtained possession of the land by fraud, and that in equity and good conscience, they are to be regarded as trustees for him. But there is not the slightest foundation for this charge. The fraud is positively denied in the answer, and no witness was called to prove it. We are not at liberty to presume fraud, and when relied on, it must be strictly proved. We are not able to perceive in the whole record, any fact which exempts this case from the operation of the statute.

The decree of the chancellor must be affirmed, with costs to the appellees, and the bill dismissed.