Nichols, et al. *v.* Gaddis & McLaurin, Inc.

No. 39318 November 15, 1954 75 So. 2d 625

208

*Craig Castle,* Jackson; *Carl E. Guernsey,* Laurel, for appellants.

*James H. Adams,* Raymond; *Vardaman S. Dunn,* Jackson, for appellee.

*James H. Adams,* Raymond; *Vardaman S. Dunn,* Jackson, for appellee.

214

ETHRIDGE, J.

Appellee, Gaddis and McLaurin, Inc., was a purchaser of land at a void foreclosure sale. The chancery court held that appellee had title to it by adverse possession after the sale. The question is whether the trial court

was warranted in finding that there was an ouster of cotenants by a cotenant in possession at the time of the foreclosure, who thereafter continued in possession as a tenant of appellee.

On December 22, 1897, the owners of a tract of land in the Second Judicial District of Hinds County containing a little less than 100 acres conveyed it to Matt Nichols and four of his sons, J. N. or "Jim" Nichols, M. C. Nichols, Willie Nichols, and Lem Nichols. Each of these five grantees thereupon became vested with an undivided one-fifth interest in the property. Only Willie Nichols is still living. All the others died intestate before 1931, leaving numerous heirs, some of whom in turn have died, leaving other heirs. However, it appears that the eight appellants own all of the Nichols' claim and interest in the record title to the land.

In 1915 the land was assessed to J. N. or Jim Nichols, and it continued to be so assessed to him through the year 1932, although he received under the 1897 deed only a one-fifth interest, and after his father's death in 1900 continued to own only a fractional undivided interest in the property.

Around 1906 J. N. Nichols bought a 19-acre tract adjoining the 100-acre tract on the west side. He and his family lived in a log cabin on the 100 acres until around 1924, when he moved to a house on the 19-acre tract.

On February 3, 1928, J. N. Nichols and wife, Mary E. Nichols, executed a deed of trust to Mrs. Sallie Y. Herring, beneficiary, with H. B. Gillespie as trustee, mortgaging the 100-acre tract to secure a debt to Mrs. Herring of $1,527.77. This deed of trust was filed for record three days after its execution. Power to appoint a substitute trustee was vested in Mrs. Herring. This deed of trust purported to cover the entire fee to the land under a general warranty of title.

In 1930 J. N. or "Jim" Nichols died intestate, leaving as his heirs his wife, Mary, and five children who are appellants in this suit, James W. Nichols, Matthew Nichols,

Curtis Nichols, Welborn Nichols, and K. B. Nichols. He also left three other children as heirs, who in 1953 conveyed their interests in the property to James W. Nichols.

On February 6, 1929, Mrs. Sallie Y. Herring executed a deed of trust to Gaddis and McLaurin, of Bolton, Mississippi, a partnership consisting of J. L. Gaddis and George McLaurin, making as collateral therein to secure a debt of $15,000.00 a number of items of personal and real property, including the 1928 note of N. J. Nichols and wife. This deed of trust by Mrs. Herring was foreclosed by the trustee, acting for Gaddis and McLaurin, beneficiary, on January 20, 1932. The foreclosure deed conveyed to Gaddis and McLaurin the 1928 note of J. N. Nichols and wife, secured by the deed of trust on the 100 acres.

Although the 1928 deed of trust from J. N. Nichols and wife authorized only Mrs. Herring, the original beneficiary, to appoint a substitute trustee, on February 2, 1932, Gaddis and McLaurin attempted to appoint a substitute trustee. This appointment was invalid, because of lack of power to make it. On March 7, 1932, the purported substitute trustee attempted to execute the power of sale and to foreclose the mortgage. The trustee's foreclosure deed conveyed the 100-acre tract to Gaddis and McLaurin, but it was void, for the reason already stated.

After the trustee's deed of 1932 to Gaddis and McLaurin was executed and recorded, the 100-acre tract was assessed to Gaddis and McLaurin on the assessment rolls of Hinds County, beginning with the year 1932 through 1953, and Gaddis and McLaurin had paid all taxes assessed against the land during that period. In 1937 this partnership conveyed its interest to appellee corporation.

In 1933 J. L. Gaddis, Jr., representing his father, drove over the 19-acre tract on one occasion and went to the fence separating the 19-acre lot from the 100-acre

tract to the east, and looked over the fence at the 100 acres. In 1934 he drove over the 100 acres. On neither occasion did Mr. Gaddis tell the Nichols of his claim. Shortly after the foreclosure, James W. Nichols, who continued to live in a house on the 19-acre tract and to farm the 100-acre tract after his father's death in 1930, received a letter from J. L. Gaddis, Sr., asking him to come to Bolton. He did so, and Gaddis advised him that he had purchased the place at the foreclosure sale. James W. agreed to rent it from Gaddis and McLaurin. On January 23, 1933, Gaddis and McLaurin leased the 100-acre tract to James W. Nichols for ten years for an annual rent of a stated amount of lint cotton from the land ginned, baled and delivered. This contract also gave James W. Nichols an option to purchase the land for $2,000.00 during the period of the lease, if he also paid the taxes, and it provided for a credit on the purchase price of any rent payments made by him. The record also reflects that in 1936, 1944, 1948, 1949, 1950, and 1951, James W. Nichols executed rent notes to Gaddis and McLaurin, and that in 1937 Gaddis and McLaurin made a new lease of the property for five years to James W. Nichols, containing a reduced rent. None of the leases were recorded. James W. Nichols paid rent to Gaddis and McLaurin from 1932 through the crop year of 1951, a period of 19 years, with cotton produced on the 100-acre tract.

In 1932 when James W. Nichols began renting the land as a tenant of Gaddis and McLaurin, he was living in a house on the adjoining 19-acre tract, with his wife and children. His mother, Mary Nichols, who was a co-signer of the deed of trust, and an uncle, Charlie Nichols, who died in 1946, lived in another house on the 19 acres.

James W. Nichols' wife knew that he was paying rent over this period of years. He said that his Uncle Charlie and his mother "might have" known that he was renting from Gaddis and McLaurin. He also obtained from them "furnish" or supplies with which to make

the crop for those years. James W. admitted that he knew during this period that Gaddis and McLaurin were claiming to own the 100-acre tract.

Early in 1952 James W. and Mr. Gaddis were unable to agree on the rent for the land for that year. Gaddis told him to go ahead and work it for a rent of one-fourth. He thought that James W. was doing that until the fall of 1952, when Gaddis learned that James W. had not made any crop on the 100-acre tract for 1952. After that, in 1952, Gaddis and McLaurin contracted to sell the land to W. P. Taylor. James W. then approached Taylor and offered to buy it from Taylor. During 1952 and 1953 James W. continued to live on the 19-acre tract, concerning which property there is no dispute. The only access to the 100-acre tract is across the 19 acres. The sale to Taylor was not completed because in June 1953 a tractor driver for Taylor was refused passage across the 19-acre tract by James W. Nichols. Taylor leased the land from appellee in May 1953, and made a crop on it that year.

On June 17, 1953, appellee, Gaddis and McLaurin, Inc., the successor in title of the partnership of Gaddis and McLaurin, filed the present suit in the Chancery Court of the Second Judicial District of Hinds County against James W. Nichols, seeking an injunction to restrain the defendant from interfering with appellee's right to an easement over the 19-acre tract, and to enjoin the defendant from placing his cattle upon the 100-acre tract or using the same in any manner. The bill was later amended to make other, nonresident cotenants defendants, and to pray for a confirmation of appellee's title. The answer of James W. Nichols denied the averments of the bill, and James W. sought by cross bill to confirm title to his undivided interest. The other seven defendants filed answers but no cross bill. Appellee, cross-defendant, denied that there was a valid legal title in cross-complainants and pleaded that appellee had obtained title by adverse possession.

The chancery court found that the foreclosure sale and deed to Gaddis and McLaurin were invalid. However, it held that appellee had obtained title to the property by adverse possession against all of the tenants in common, and that appellee had also obtained an easement over the 19-acre tract by prescription. Hence the final decree adjudged that Gaddis and McLaurin, Inc., was the owner of the 100-acre tract and of an easement across the 19 acres. The claims of appellants were cancelled.

The chancery court held that there was an ouster of all of the cotenants, including those who lived away from the land, which began the ten-year statute of adverse possession running, and that appellee had obtained title to the land by adverse possession. Appellants argue that this finding is contrary to the great weight of the evidence considered in the light of established legal principles pertinent to this issue.

■■ Because of the mutuality of their interests, possession and obligations, the relationship between cotenants is confidential and fiduciary in nature. Each has a duty to sustain, or at least not to assail, the common interest and to sustain and protect the common title. It is a relationship of trust and confidence between co-owners of property. 86 C. J. S., Tenancy in Common, Sec. 17.

■■ An ouster is the wrongful dispossession or exclusion by one tenant in common of his cotenants from the common property of which they are entitled to possession. ■■ An ouster cannot be proved merely by acts which are consistent with an honest intent to acknowledge the rights of the cotenant. It does not necessarily imply an act accompanied by force. ■■ Because of the relationship between tenants in common, possession which in ordinary cases would constitute adverse possession is not sufficient where entry was made as a tenant in common. In the present case, before the foreclosure in 1932 James W. Nichols was in possession

of the property as a tenant in common. ▮▮ In order to establish ouster of cotenants by a tenant in common in possession, the cotenants out of possession must have notice of his adverse claim either "from actual knowledge or as is sometimes vaguely expressed, by acts equivalent thereto," as by conduct so unequivocal that knowledge on the part of the cotenant out of possession must be necessarily presumed. Hurst v. J. M. Griffin & Sons, Inc., 209 Miss. 311, 46 So. 2d 440, 47 So. 2d 811 (1950). The Hurst case further holds: "The testimony of such knowledge by the other tenants in common must be clear and convincing. Fox v. Wilkins, 201 Miss. 78, 28 So. 2d 577. ▮▮ It is not enough that the possession to convey title should be apparently adverse but must be such with actual notice to the cotenants or shown by such acts of repudiation of their claim as are equivalent to actual notice to them."

▮▮ In accord with these principles, the trial court was warranted in finding that James W. Nichols, his mother, Mary Nichols, Lou Toy McGowan, and Charlie Nichols knew of appellee's adverse claim and possession, and that appellee had ousted them and owned title to their interests by adverse possession. James W. admitted that he knew, during the entire period of 19 years in which he was leasing the property from appellee, that appellee claimed title to it. During this time James W. took leases from appellee and executed notes to evidence the rent which he admittedly paid. He possessed the property as appellee's tenant, and appellee relying thereon paid the taxes on it. He voluntarily assumed the status of a tenant attorning to his landlord, the appellee. A tenant in possession is estopped to deny his landlord's title. 51 C. J. S., Landlord and Tenant, Sec. 266. Appellants contend that an owner of an undivided interest in land cannot hold against himself as a tenant of another. This question was mentioned but not decided in Heidelberg v. Duckworth, 206 Miss. 388, 40 So. 2d 179 (1949). ▮▮ However, in the

present case appellee took possession of the property through its tenant, James W. Nichols, and James W. over a period of 19 years knew of appellee's claim to the land and acknowledged it by renting the land from appellee. It is undisputed that appellee as well as James W. acted in good faith in claiming title to the property. He is estopped by his long continued course of conduct from now denying appellee's title to his inherited, undivided interest as a cotenant.

The chancery court was also warranted in finding that appellant Mary Nichols, the mother of James W. Nichols, and the wife of J. N. or Jim Nichols, had actual knowledge or the equivalent that appellee during the entire period from 1932 through 1951 was claiming title to the property and was in possession of it through its tenant, James W. Nichols. Mary Nichols executed in 1930 the deed of trust on the 100-acre tract along with her husband, J. N. or Jim Nichols. During all of this period she was living in one of the two houses on the 19-acre tract near to James W. and his family. The chancellor was justified in concluding that in reason and common sense she must necessarily have known that James W. was renting the 100 acres from appellee and paying appellee as rent cotton produced from that land. Guion Williams, who had been associated with Gaddis and McLaurin since 1917 and is now secretary-treasurer of the corporation, testified that he prepared the leases and rent notes, and that after the property was foreclosed in 1932, James W. and "his mother, I understood at that time," came down and wanted to rent the 100 acres.

Charlie Nichols, James W.'s uncle, lived with the rest of the family for most of the period from 1928 until his death in 1946. James W. first testified that Charlie lived for this entire period in an old log cabin on the 100-acre tract, but later he said that Charlie lived in a house on the 19 acres from 1928 to 1933, and that from the latter date until 1945 Charlie lived in the log house

on the 100 acres. Louis Nichols, the wife of James W. Nichols, testified to the contrary. She said that Charlie was living in the log house on the 100 acres in 1930, but that he lived there only about a year, when he got in bad health and moved in the house with his sister-in-law on the 19-acre tract. The chancellor was justified in concluding, as we must assume that he did, that Charlie did not lived on the 100 acres but rather the 19-acre tract during the period James W. was renting from appellee, and that because the Nichols families lived together on the same tract in houses near each other, Charlie in reason must necessarily have known that James W. was renting the 100 acres from appellee. James W. testified that he did not know whether Charlie knew he was paying rent to appellee, he did not say anything to Charlie about it, but he "might have" known; and that he was "making no secret about it."

We also think that the interest of appellant, Lou Toy McGowan, cotenant, is in the same position as Charlie Nichols' interest is. Lou Toy is the child of Lem Nichols' sister, Ethel Nichols, who died in 1918. Lou Toy moved on the 19 acres along with Lem and his wife, Henrietta, another appellant, in 1927. Apparently, Lem and Henrietta were taking care of her at that time. Lem died in 1930, and Henrietta moved to Louisiana. According to James W. Nichols, Lou Toy then went to live with his mother, Mary Nichols, who was living on the 19 acres. Lou Toy's answer in this suit admits that she and also Charlie Nichols were living in 1932 in a house near the 100 acres, apparently on the 19-acre tract, and were farming the 100-acre tract. The answer admits that for the 18 years during which appellee claims adverse possession, she, along with James W. and Charlie Nichols, was living in a house near the 100 acres, and was farming that tract. Since Lou Toy was living on the 19 acres in a house near to that of James W. Nichols, and was helping him cultivate the 100-acre tract, we cannot say that the chancellor was manifestly wrong

in holding that she, as well as Charlie and Mary, either had knowledge or its equivalent to the effect that James W. was renting the land from appellee, who was claiming to own it, and attorning to appellee as a tenant. The chancellor could well have concluded that Lou Toy McGowan, living on the same small tract with her kinsmen and helping them cultivate the 100 acres, must necessarily have known of James W.'s tenancy and of appellee's adverse claim.

Under all of these circumstances, we think that the chancellor was justified in concluding that Mary and Charlie Nichols, cotenants, and Lou Toy McGowan knew that appellee was claiming title to the 100 acres, and knew that James W. was in possession of that tract as the tenant of appellee.

On the other hand, we do not think that an ouster of the remaining cotenants was established by appellee. There was no proof whatever that the other cotenants, most of whom lived in other states during that period of adverse possession claimed by appellee, had any actual knowledge that appellee was claiming to own the land and was possessing it adversely through a tenant, their cotenant, James W. Nichols. Prior to the 1932 foreclosure, James W. Nichols was in possession of the land as a cotenant. After the attempted foreclosure, the same cotenant, James W., continued in possession of the property without any ostensible change. In Smith v. Anderson, 193 Miss. 161, 8 So. 2d 251 (1942), it was held that this is an important circumstance; that a purchaser at a void tax sale was required to do something to denote a change in the character of possession as compared with that preceding the commencement of the three-year adverse possessory period asserted in that case; and that the change must be such as would afford notice to the former owner that the land is being appropriated by another to his use. In that case a cotenant in possession continued in possession as a tenant of the purchaser at the tax sale.

Nor was there any physical entry by appellee which would suffice to give the other cotenants out of possession notice of appellee's adverse claim. On one occasion in 1934 J. L. Gaddis, Jr., acting for his father, drove in his car over the 100 acres. He talked to none of the Nichols at that time. James W. Nichols testified that the same Mr. Gaddis sometime in 1933 drove on the 19-acre tract and looked over the fence dividing it from the 100 acres, but that Mr. Gaddis did not talk with any of the Nichols at that time. ██ ██ Appellee paid taxes on the property, but, although that is strong evidence of a claim of title, it does not suffice to give notice of appellee's claim to the other cotenants. McCaughn v. Young, 85 Miss. 277, 37 So. 839 (1904). The burden of paying taxes is one which devolves equally upon all of the cotenants, and one in possession and receiving all the profits is deemed to have undertaken the discharge of certain duties to the other cotenants, such as payment of taxes, at least to the extent of the profits he receives. 14 Am. Jur., Cotenancy, Sec. 41.

██ ██ On the wall of the chancery clerk's office in Raymond was an ownership map of the county, stating title in this land to be in Gaddis and McLaurin, but that gave no notice to cotenants out of possession. The evidence as to general reputation of ownership in the community was ambiguous. ██ ██ And, for reasons hereinafter stated, we do not think that the recording of the void trustee's deed to appellee gave any notice to the other cotenants of the grantee's adverse claim.

The cotenants, other than James W. Nichols, Mary and Charlie Nichols, and Lou Toy McGowan, lived away from the property, and the stated circumstances wholly failed to show that they had either actual knowledge or the equivalent of that, of appellee's claim and adverse possession of the land. The same cotenant continued in possession after the foreclosure as before, but as tenant of appellee. Accordingly, we think that the trial court

was in error in finding an ouster of the tenant in common, other than James W. Nichols, Mary Nichols, Charlie Nichols, and Lou Toy McGowan.

It is suggested that J. N. or Jim Nichols acquired full title to the 100 acres prior to his death in 1930, by paying taxes on the land from 1915 to 1930, and by living on it and claiming the same adversely to his cotenants, the other four grantees in the 1897 deed. J. N. Nichols moved off of the 100 acres and onto the 19-acre tract around 1924. The 19 acres were bought around 1906, and in later years various members of the Nichols family lived on the 100-acre tract. Neither James W. Nichols nor any other of the defendants' witnesses testified that for more than ten years prior to 1930 J. N. Nichols was claiming the land adversely to his cotenants. Herbert Wilson, a witness for appellee, testified that he came to Mississippi in 1913 and lived on land adjoining the 100-acre tract; that he knew J. N. Nichols, and that at some indefinite time not stated by the witness, J. N. Nichols told him that the land belonged to him. But since J. N. Nichols was a cotenant in possession of the land until his death in 1930, and since the evidence clearly shows that the 100-acre tract was lived on by numerous members of the Nichols family for many years before 1930, as a family property, we do not think that J. N. Nichols acquired full title to the land before his death. Clear and convincing evidence is essential to support an ouster by a cotenant and moreover, with the possession scrambled among various members of the Nichols family, the rule that possession by a cotenant in common with other owners is not exclusive is pertinent. 2 C. J. S., Adverse Possession, Sec. 48; 1 Am. Jur., Adverse Possession, Sec. 142.

Appellee urges that the recording of the trustee's foreclosure deed to Gaddis and McLaurin in 1932 is sufficient within itself as a legal ouster and disseisin of the cotenants, and that the recording of the deed alone

is constructive notice to them of appellee's adverse possession, and is sufficient to start the running of the ten-year adverse possession statute.

Appellee's contention is based primarily upon the authority of Peeples v. Boykin, 132 Miss. 359, 96 So. 177 (1923). Mrs. M. J. Rosser died intestate in 1899, owning certain land in Bolivar County. She left as some of her heirs one son by her first marriage, W. G. Peeples, a complainant, and also the heirs of a daughter by her first marriage, Mary Peeples, also complainants. She also left as her heirs four children by her second marriage, Lena, Lillian, and Henry Rosser, and a child who died while a minor, intestate, unmarried, and without issue. The complainant lived in Grenada County, and the heirs of his sister, Mary Peeples, also lived away from Bolivar County, some of them in Oklahoma. Lena Rosser married a man named Boykin. The opinion is not clear as to whether Lena Boykin was in possession of the property at the time of her mother's death in 1899, or immediately after. But she was in possession in 1904, when her brother and sister, Lillian, conveyed to her "our two-thirds undivided interest in and to the land inherited by us and the grantee from our mother . . . The above land is now owned by us and the grantee herein as the only heirs at law of our said mother and it is our intention to convey all interest in said land which we inherited from our said mother." The deed was recorded in the same month that it was executed, May 1904.

Complainants sought a partition of the property. None of them had actual knowledge that their mother, Mrs. Rosser, owned any property at the time of her death. Lena Boykin advised W. G. Peeples of their mother's death about three months after it occurred, but did not tell him that she owned any land. Complainants did not go to Bolivar County after Mrs. Rosser's death to ascertain whether she owned any property, and never saw any of the other children until 1920,

twenty-one years after the death of Mrs. Rosser, when they learned that she had owned the land in question, and brought this suit for partition. After 1904, the date of the deed to her, Lena Boykin was in possession of the land, and in the suit she pleaded title to all of it by adverse possession under the deed from her brother and sister, to the exclusion of the complainants. She had placed mortgages upon the property in 1904, 1905, 1906, and 1907. Complainants asserted that they had no knowledge of any hostile claim of Lena, and, since she was a cotenant, she was in possession for all cotenants. The chancery court held that Mrs. Lena Boykin was the sole owner of the land by virtue of her adverse possession. This decree was affirmed on appeal. The Court said that the question was whether the recording of the 1904 deed to Mrs. Boykin and of the later mortgages was sufficient to give notice to complainants of a hostile assertion of title by her. It was held that, "the record of the deed imparts notice to the world of its contents," and that "this is as effectual for setting the statute in motion as actual notice would have been;" that "the recording of the deed in 1904 gave notice to the claim asserted by the defendant under the deed."

Since this decision in 1923, Peeples v. Boykin has been cited in several cases, and in at least two opinions the Court expressed doubt as to its literal correctness. In none of the cases citing Peeples v. Boykin did the Court rely upon a recorded deed alone as being notice to the other cotenants of the adverse possession and ouster of them.

In Thomasson v. Kinnard, 153 Miss. 398, 121 So. 109 (1929), the Court did not apply Peeples v. Boykin, but observed that it merely holds a fee simple deed to a cotenant may constitute "color of title." Color of title determines the area to which an adverse possessory claim extends, but presupposes that there is adverse possession. The following cases cite Peeples v. Boykin but involve situations where the Court found that there was

actual knowledge of the other cotenants that the person in possession was claiming as the owner of the entire title: Farnsworth v. O'Neal, 158 Miss. 218, 130 So. 101 (1930); Davis v. Gulf Refining Co., 202 Miss. 808, 32 So. 2d 133, 34 So. 2d 731 (1947); McDonald v. Roberson, 204 Miss. 737, 38 So. 2d 189 (1948).

Alewine v. Pitcock, 209 Miss. 362, 47 So. 2d 147 (1950), stated that it was unnecessary there to invoke the decision of Peeples v. Boykin. The facts reflected the equivalent of actual knowledge. In Chatman v. Carter, 209 Miss. 16, 45 So. 2d 841 (1950), the Court cited Peeples v. Boykin in observing that the execution of a mineral deed was "evidence of an ouster," but there were numerous other circumstances which it was thought might be sufficient on a new trial to make a question of fact as to whether the cotenant's possession had ousted the other cotenant. In Hurst v. J. M. Griffin and Sons, Inc., 209 Miss. 381, 46 So. 2d 440, 47 So. 2d 811 (1950), and Smith v. Smith, 211 Miss. 481, 52 So. 2d 1 (1951), the Court cited Peeples, but affirmed a finding of the trial court that there had been no ouster. See also Walker v. Easterling, 215 Miss. 429, 61 So. 2d 163 (1952); Wall v. Wall, 71 So. 2d 308 (Miss. 1954).

In Boyd v. Entrekin, 209 Miss. 51, 45 So. 2d 848 (1950), the facts involved considerably more than the recordation of the 1902 deed to support an ouster of the cotenants. Appellants admitted that they thought it was their mother's land and knew that she had possessed it as her own for over sixteen years after all of the children reached majority. She did not act in bad faith. The cotenants had been completely indifferent to their rights. Two of the appellants were present when the mother was negotiating in 1936 to sell to Entrekin, and one was present when the deed was signed. It was held that they were so completely indifferent to their rights that they should not be permitted in equity to prevail over one acting in good faith and for a sufficient consideration. Boyd v. Entrekin was properly decided on

the facts. Peeples v. Boykin did not determine that decision. Eastman Gardiner and Co. v. Hinton, 86 Miss. 604, 38 So. 779 (1905), is not in point. A stranger there entered into possession, not a cotenant, as here.

In McDonald v. Roberson, supra, it was pointed out that the "soundness of the opinion in Peeples v. Boykin has been frequently questioned, and we have mentioned it in order to disclose that we do not base our present decision upon it." In Hurst v. J. M. Griffin and Sons, Inc., supra, the Court again indicated that it would not accept literally the expressions in that opinion.

 Peeples v. Boykin was incorrectly decided. We do not think that the mere recording alone of a fee simple deed by a cotenant "imparts notice" to other cotenants of an adverse claim to land by the grantee-cotenant, and do not think that "this is as effectual for setting the statute in motion as actual notice would have been," as was held in Peeples. This ignores the nature of the relationship of tenants in common, and the fact that a tenant in common out of possession is entitled to assume that a cotenant in possession holds for all cotenants, until he is given knowledge to the contrary, or the equivalent thereof, which must be shown by clear and convincing evidence. As was said in Hulvey v. Hulvey, 92 Va. 182, 23 S. E. 233 (1895), "No one is required to watch the clerk's office to see that those in possession of property in privity with him or in subordination to his title are not acquiring rights adverse to him."

The rule consistent with reason, precedent, and sound morals is that stated in 1 Am. Jur., Adverse Possession, Sec. 56.1 (1954 Supp.): "Conceivably, a court may hold that a tenant in sole possession of land may by merely recording a deed thereof purporting to convey full title to himself give notice to his cotenants of a purpose, otherwise secret, to hold the premises exclusively, but no decision unmistakably to that effect has been found . . . The general conclusion which seems

most consistent with the cases as a whole . . . is that the mere record of a deed purporting to convey the entire property in land to a tenant in possession is not, as matter of law, notice to cotenants of the adverse character of the grantee's possession; although it is true that such record taken together with significant circumstances attending the grantee's possession may justify, and in some instances may require, a finding of notice. While, according to the view generally adopted, the record of a deed to an avowed cotenant in possession is notice to the other cotenants of the existence of the deed, such record is not, according to the prevailing view, in itself notice that the grantee is claiming adversely under the deed and not as a cotenant." See also ibid., Secs. 53, 54, and 56; 86 C. J. S., Tenancy in Common, Sec. 38, pp. 398-399; Anno. 121 A. L. R. 1441 (1939). . The fact that here the possession by a cotenant was not for himself as owner but as a tenant for one claiming under a void trustee's foreclosure deed does not deflect application of these principles. He was in possession before and after the foreclosure. For these reasons Peeples v. Boykin is hereby overruled. We adopted the principles stated above.

 Appellee says that Peeples v. Boykin establishes a rule of property, and the overruling of it cannot be made applicable to this case, but only prospective. However, we do not think that it is a rule of property within that sense of the . term. Peeples v. Boykin simply stated an evidential test as to the quantum and weight of evidence to be considered in determining the time when the period of adverse possession begins to run. It deals with a question of fact not law. It is not even a rule of evidence within the common law sense of that term. Cf. 21 C. J. S., Courts, Secs. 212, 213.

The inherited interests of appellants, James W. Nichols, Lou Toy McGowan, and Mary Nichols, to the extent that the ten-year statute of adverse possession has run on such interests in favor of appellee, are vested in ap-

pellee. On the other hand, where the ten-year statute has not run on a particular interest inherited by these three appellants, the ten-year period being computed from the date of acquisition of such interest, appellee of course has obtained no title to that interest. The title inherited by Charlie Nichols, who died in 1946, is vested in appellee. The inherited interests of appellants, Henrietta, Curtis, Matthew, Welborn and K. B. Nichols, for reasons already stated, are vested in them and not in appellee. The interest purchased by James W. Nichols in a deed dated March 5, 1953, from Willie Nichols and eight other cotenants is not subject to appellee's claim, and is owned by James W. Nichols. At that time he was not a tenant of appellee. He last rented the 100 acres from appellee in 1951. Moreover, at that time he was asserting an interest contrary to appellee. And since he did not execute any instrument of conveyance under which appellee claims, the after-acquired property doctrine is not pertinent. In view of the numerous fractional interests of the parties and of the nature of the case, this cause is reversed and remanded for further proceedings in the chancery court in accordance with this opinion.

Reversed and remanded.

*McGehee, C. J., Roberds, Kyle, Holmes, Arrington* and *Gillespie, JJ.*, concur.

LEE, J., concurring in part and dissenting in part.

I concur with the majority that the inherited interest of J. W. Nichols, together with the interests of Mary Nichols, Charlie Nichols, and Lou Toy McGowan, were correctly vested in the appellee by the decree of the lower court.

Obviously, H. B. Gillespie, trustee, and Mrs. Sallie Y. Herring, mortgagee, were strangers to the title when J. N. Nichols and wife, Mary E. Nichols, by recorded deed of trust of date of February 6, 1928, conveyed and war-

ranted this land, without restriction or limitation, to the trustee for the benefit of Mrs. Herring. Manifestly Gaddis and McLaurin were strangers to the title, when on March 7, 1932, they thought they were obtaining title from the trustee as a result of the foreclosure of that deed of trust.

"Adverse possession of property under a void or defective deed may ripen into title, and a void or worthless deed may be sufficient to show the hostile character of the possession, or the date on which adverse possession began, and the nature and extent of possession." 2 C. J. S. 591, Adverse Possession, c., Section 72.

I am unable to distinguish any difference between their situation, as strangers to the title, and the situation of the parties in Eastman Gardiner, et al. v. Hinton, 86 Miss. 604, 38 So. 779, Davis v. Gulf Refining Company, 202 Miss. 808, 32 So. 2d 133, and Chatman v. Carter, 209 Miss. 16, 45 So. 2d 841.

In the Eastman Gardiner case, supra, Mrs. Hinton and Isaiah and Nathaniel Creel were the owners of the lot in question. In 1885, Isaiah made a deed to John Creel, a stranger to the title, for the whole lot, but the deed was not recorded until 1895, when, by mesne conveyances, the title became vested in Eastman Gardiner by warranty deed. Mrs. Hinton was never notified that any of the defendants were claiming her interest in the property, and she filed suit on February 20, 1903, less than ten years since the recordation of the deed. In the meantime, the defendants had exercised control over the property since the execution of Isaiah's deed. The Court held that: "The occupancy of John Creel in 1885 was founded on an instrument which, by its very terms, constituted such an act of ouster as would have justified appellee (Mrs. Hinton) in bringing ejectment for the property." The opinion cited with approval 45 Cent. Dig., Tenancy in Common, Section 39; Washburne on Real Property, Section 883, as follows: "When one tenant in common of land conveys the whole estate in fee,

with covenants of seizing and warranty, and the grantee enters and holds exclusive possession thereof, such entry and possession are a disseizin of the cotenant.'' It also cited with approval Greenhill v. Biggs (Ky.), 2 S. W. 774 (7 Am. St. Rep. 579); Rutter v. Small, 68 Md. 133 (11 Atl. 698; 6 Am. St. Rep. 434). ''When the vendee of one tenant in common sets up claim in his own right to the whole tract of land, and enters and holds possession open and continuously for more than the statutory period, his possession is adverse, and a recovery by the other tenants in common is barred, although they had no actual notice of the adverse character of the possession.''

The Court, in its opinion, explained that: ''The principle which requires actual notice, or acts of repudiation equivalent thereto, applies only to cases where there is some relation between the occupant and the holder of the legal title, which imposes upon the occupant the obligation of giving notice, either actually or 'shown by such acts of repudiation of their claim as are equivalent to actual notice,' as a condition precedent to the assertion of any hostile claim by him.''

In the Davis case, supra, the widow and five children, all of the heirs of D. L. Davis, deceased, except Willie E. Davis, conveyed the land in question by warranty deed, recorded May 6, 1931, to W. W. Dearman, a stranger to the title. The bill by the wife and son of Willie E. Davis was filed on January 29, 1945, more than ten years after the recordation of the deed. The opinion said: ''The execution of the warranty deed by the heirs of D. L. Davis, as cotenants, to Dearman, a stranger to the title, was an assertion of title and an assumption of dominion which was at once a repudiation of the tenancy and a challenge to the missing cotenant, appellant. Its execution and recordation constituted in legal effect a disseisin and operated as an ouster. Appellant was thereby put upon notice of the asserted

236

claim of his cotenants, and was put under a duty to challenge their assumption by proper proceedings."

In the Chatman case, supra, it was held that the execution of an oil and gas deed by Eliza Carter, widow of the claimed parol donee of the land, to Anderson, a stranger to the title, was evidence of ouster.

It is true that, in this case, the conveyance was a deed of trust, whereas in the cases enumerated above, the conveyances were deeds. But no authority has been cited to show that the warranty in a deed of trust is less effective than in a deed. Gaddis and McLaurin assuredly did not know that they were cotenants with anyone else. They were implicit in their belief that they were the sole owners. It was only at the end of a lawsuit, twenty-two years later, that it was ascertained that the foreclosure of the deed of trust was illegal, and, on that account, it can now be said that they were actually cotenants at the time of their entry. If the premise, that Gaddis and McLaurin were strangers to the title is sound, then the principles laid down in the Eastman Gardner, Davis and Chatman, cases, supra, are applicable.

One of the maxims of equity is that it aids "the vigilant, not those who slumber on their rights." Pomeroy's Equity Jurisprudence, 4th Ed., p. 783.

I concede that one should not be required to go to the records every year to ascertain whether his cotenant has encumbered the joint property. But I maintain that he should find out about the state of the title at least once in ten years. Herbert Wilson, whose land joins this tract, testified that, when he first came to Mississippi in 1913, J. N. Nichols told him about this land belonging to him, and pointed out the lines. Besides, J. N. Nichols had it assessed to himself from 1915 until his death. The record indicates that from 1913 until 1927, when Lem Nichols moved on the place, J. N. Nichols exercised control over this land. There was not the slightest proof that the appellants, or either of them,

from the date of J. N.'s death until 1952, a period of twenty-one years, manifested any interest whatsoever in the land. If they had inquired, they would have found out that Gaddis and McLaurin were claiming it, that they had a deed of record, that the map of the county showed their ownership, that they were paying the taxes, and that J. W. Nichols was their tenant and was paying rent to them. For this long period of time, they manifested no interest in the state of title, or the payment of taxes, or an accounting for rents. They slumbered on whatever rights they had. To me, the inference is inescapable that they knew about the foreclosure, and were of the opinion either that they had no interest in the land, or, if they in fact did have an interest, they had lost it. Such an utter lack of interest and concern for this period of time should not be excused.

Lem and his wife, Henrietta, lived on the place from 1927 until 1930. It is unthinkable to me that they did not know about the execution of the deed of trust in 1928. Gaddis and McLaurin's possession from 1933 until 1952 was absolute.

The principle in Peeples v. Boykin, 132 Miss. 359, 96 So. 177, has been well-settled since 1923. The case has been often cited, some of which citations are referred to in the majority opinion. It would have been an easy matter for the Legislature to change this rule, if it had not met with popular approval. In view of the majority opinion, I realize the futility of urging the retention of this principle further than to say that I think it ought to be available in this kind of case, and I am averse to overruling it, although I do not think it necessary to apply it in this case.

The majority opinion takes the position that Gaddis and McLaurin's physical entry was insufficient. Well, they actually went upon the land under color of title. It was not necessary to throw off bodily those on the land. As a matter of fact, they were living on the 19-acre

tract. They recognized the right of Gaddis and McLaurin to possession, and "no force or violence is necessary to constitute an ouster." Iler v. Routh's Heirs, 3 How. 276, 4 Miss. 276.

Gaddis and McLaurin received all of the rents for this long period of time, and "any act of one joint tenant which is evidence of a claim of exclusive ownership, *such as taking all the rents and profits to himself will constitute a disseisin.*" (Emphasis supplied.) Iler v. Routh's Heirs, supra.

It has been said that payment of taxes for twenty-four years was "powerful evidence of the claim of right * * *," and that "It is some evidence that the possession was under a claim of right and was adverse." See Native Lumber Company v. Elmer, 117 Miss. 720, 78 So. 703, as follows: "Discussing the question of the payment of taxes as evidence of adverse possession, the supreme court of the United States says: 'Payment of taxes, as described in the above statement of facts, is very important and strong evidence of a claim of title; and the failure of the plaintiff's predecessors to make any claim to the lot, or to pay the taxes themselves, is some evidence of an abandonment of any right in or claim to the property. In Ewing v. Burnet, 36 U. S. (11 Pet.) 41 (9 L. Ed. 624), it was held by this court that the payment of taxes on land for twenty-four successive years by the party in possession was powerful evidence of the claim of right to the whole lot upon which the taxes were paid. The same principle is held in Fletcher v. Fuller, 120 U. S. 534, 552 (7 Sup. Ct. 667, 676, 30 L. Ed. 759, 764.)'"

I do not think that Smith v. Anderson, 193 Miss. 161, 8 So. 2d 251, cited in the majority opinion, is applicable here. That case was a construction of Section 716, Code of 1942, the statute providing for three years actual occupation under a tax title. The opinion there pointed out the difference between this statute and Section 711, Code of 1942, the ten-year adverse possession

statute. In the former, actual occupancy was required, whereas in the latter, one may acquire title by exercising acts of ownership and control over land, without actually occupying it.

The majority opinion holds that J. W. Nichols can maintain his claim for his after-acquired interest, with which conclusion, I disagree.

If, in 1933, he had refused to recognize the claim of Gaddis and McLaurin, or, if he had asserted his claim or the claim of others, very probably Gaddis and McLaurin could have validated their foreclosure and could have established full title in their predecessor, J. N. Nichols, because of his possession from 1913 until 1927, and the execution of the deed of trust thereon in 1928, as previously stated. But by his recognition of Gaddis and McLaurin's title, and by his silence in failing to assert a claim for himself and others, he induced and abetted Gaddis and McLaurin to rest in peace with their title and possession. How can he now, by acquiring interests of those, who, it is said, had no actual notice of Gaddis and McLaurin's possession, defeat, in his own right, the title and possession of Gaddis and McLaurin, which he himself had a major part in establishing? Such a position is contrary to the principles of equitable estoppel.

In Hart v. Livermore Foundry & Machine Company, 72 Miss. 809, 17 So. 769, it was said: "Estoppel operates only in favor of one who, in reliance upon the act, representation or *silence* of another, so changes his situation as that injury would result if the truth were shown." (Emphasis supplied.) The principle there stated was cited with approval in Garmon v. Fitzgerald, 168 Miss. 532, 151 So. 726, and Gulf Refining Company v. Travis, 201 Miss. 336, 29 So. 2d 100.

In Kelso v. Robinson, 172 Miss. 828, 161 So. 135, as to equitable estoppel, this Court said: "Estoppel may arise from misleading silence or passive conduct joined with a duty to speak. The doctrine lies at the foundation of morals; it is based on equity and good conscience."

See also Martin v. Hartley, 208 Miss. 112, 43 So. 2d 875; Stokes v. American Central Insurance Company, 211 Miss. 584, 52 So. 2d 358.

In 19 Am. Jur. 641-642, Estoppel, Section 42, it is said that this principle, which rests on morality and fair dealing, "holds a person to a representation made or a position assumed where otherwise inequitable consequences would result to another who, having the right to do so, under all the circumstances of the case, has in good faith relied thereon and been misled to his injury." See also Section 55, pp. 661-662 thereof, where it is recognized that an estoppel may arise from silence or inaction, and it is said that: "The principle underlying such estoppels is embodied in the maxim 'one who is silent when he ought to speak will not be heard to speak when he ought to be silent.'"

I would affirm.

HALL, J., dissenting.

I concur in the action of the majority in overruling the case of Peeples v. Boykin, 132 Miss. 359, 96 So. 177, but I do not concur in the holding that a part of the cotenants are entitled to an interest in the land in controversy. In my opinion they are all barred from recovery both by estoppel and by laches.

### ON SUGGESTION OF ERROR

March 16, 1955 78 So. 2d 471

*Roberds, P. J.*, overruled without written opinion.

GILLESPIE, J., dissenting.

Appellee filed a suggestion of error in which seven errors were suggested. The Court called for a reply to only one point: The doctrine of recordation as laid down in Peeples v. Boykin, 132 Miss. 359, 96 So. 177, affects titles to real estate, is a rule of property, and is the law of this case. The majority overruled the sug-

gestion of error and thereby adhered to the decision of the original opinion to the effect that Peeples v. Boykin, supra, did not establish a rule of property.

With deference, I am unable to agree to the conclusions of the majority on the stated question. I think the rule laid down by Peeples v. Boykin, and as understood by the bench and bar, established a rule of property; and the change in the rule should be applied prospectively, but all transactions occurring prior to the change in the rule should be controlled by the rule of property existing at the time of their occurrence.

This Court has said that the stability and certainty of rules relating to muniments of titles to real estate is of first importance. The law favors the repose of society in general; it especially favors stability in the law as it affects or involves the descent, transfer, sale, title, or possession of property. Courts sometimes find that a rule of law that affects or involves these considerations is unsound and mischievous in operation and should be overruled; whereupon two competing considerations confront the Court, (1) The need for stability in the law affecting property, and the protection of rights and titles established under the unsound rule, and (2) the need for a change in a rule of law that has proven to be unsound and mischievous in operation. The Court then has a choice of either refusing to change the rule or of changing the rule only as to transactions occurring subsequent to the change. In either case, the vested rights and titles acquired while the error prevailed are upheld and protected.

Appellee contends that Peeples v. Boykin established a rule of property in that it was there held that recordation of the deed purporting to convey the full title plus possession by a cotenant for ten years vested complete title; that notice to the cotenants was conclusively presumed from these circumstances. That seems to me to be what the bench and bar has understood the case to hold. In 1948, after Peeples v. Boykin had been in the

books for twenty-five years, this Court said of that decision, in the case of McDonald v. Roberson, 204 Miss. 737, 38 So. 2d 189, the following.

"In Peeples v. Boykin, 132 Miss. 359, 96 So. 177, this Court held that where a person who would otherwise be a tenant in common remained in exclusive and continuous possession, claiming to be the owner under a recorded deed purporting to convey the entire interest in the property, the title would mature in the occupant on the expiration of ten years from the date of the recordation of the deed, even though the deed in severalty was made by other tenants in common, and there was no visible change in the character of the occupancy after the recordation of the deed, and no actual notice was given by the occupant — the theory being that when the deed was recorded, that fact, coupled with the occupancy under it, gave rise immediately to a cause of action to the cotenants whose interests had not been conveyed."

The annotators of every code since Peeples v. Boykin was decided have placed the following annotation under what is now Section 711, Mississippi Code of 1942:

"Tenant in common cannot acquire title against cotenant without notice; recorded deed held notice to cotenant of adverse claim. Peeples v. Boykin, 132 M. 359, 96 So. 177."

The definition of a rule of property is set out in 54 C. J. 1110, Section 8, as follows: "Rule of Property. A settled legal principle governing the ownership and devolution of property; the decisions of the highest court of a state when they relate to and settle some principle of local law directly applicable to this. In the plural, those rules governing the descent, transfer, or sale of property, and the rules which affect the title and possession thereto."

"Rules of property are defined as those rules governing the descent, transfer, or sale of property, and the

rules which affect the title and possession thereof."
Bucher v. Chesire R. R. Co., 125 U. S. 555, 31 L. Ed. 795.

In Fuller v. Mullins, 143 Ky. 639, 137 S. W. 243, the
holding is summarized in the headnote as follows: "The
rule that certain things are sufficient for acquisition of
title by adverse possession disclosed in a long series of
opinions by the supreme court has become a rule of prop-
erty, from which, under the rule of stare decisis, it can-
not depart."

In Stewart v. Hunt, (Mich.) (1942) 5 N. W. 2d 737,
there was involved the question as to adverse possession
of an easement and the issue was whether a user by suc-
cessive owners could be tacked together to reach the
prescribed time. The court had previously held in the
negative, but recognized that the previous decision was
against the overwhelming weight of authority. The
court applied its former decision, saying: "Any change,
if desirable, should be accomplished by legislation, pro-
spective in operation, rather than by judicial redecision,
which would disturb vested rights."

A rule of property as a legal principle has been ap-
plied by this Court in a number of cases. In Webb v.
Mobile and Ohio R. R. Co., 105 Miss. 175, 62 So. 168, the
validity of a tax sale was involved. The Court held
that the rule, under prior decisions, that parol evidence
was admissible to correct a deed was a rule of proper-
ty. The Court said: "The stability and certainty of
rules relating to muniments of title to real estate is of
first importance."

In Forest Production and Manufacturing Co. v. Buck-
ley, 107 Miss. 897, 66 So. 279, the Court declined to over-
rule a former decision as to the construction of a timber
deed because the former decision was a rule of property.

In Robertson v. Puffer Manufacturing Co., 112 Miss.
890, 73 So. 804, there was involved the question of
whether a document was a lease or a conditional sales

contract. The Court held that a previous decision holding such document a lease was a rule of property and declined to overrule it.

The rule of property principle was applied in the case of K. C. Lumber Co. v. Moss, 119 Miss. 185, 80 So. 638. A tax sale was there involved.

In Magee v. Morehead, 123 So. 881, a rule of property was held to be involved and the Court declined to overrule the decision under which it was established.

In Daniel Boon v. Bowers, 30 Miss. 246, the Court declined to overrule a prior decision because of the "important bearing upon titles to property."

In Yazoo & M. V. R. Co. v. Adams, 81 Miss. 90, 32 So. 937, this Court said: "* * * A 'rule of property' is a 'settled legal principle governing the ownership and devolution of property.' This principle can be settled only by the supreme court of the state, and its utterances, in cases pending before it involving the title to property, construing statutes or constitutional provisions, have the effect of establishing a rule of property to the extent only that the particular statute or constitutional provision was in that case involved, or necessarily considered and determined by the court in the case then pending before it; and such rule of property, when so established, becomes and remains the settled legal principle governing the acquisition and title to property, to which construction is applicable, so long as such decision remains unreversed by the supreme court giving such construction. If such construction is given upon an issue directly involved in the case, or necessarily considered, and necessitates the application of the judicial mind to the precise question, then immediately the rule of property established thereby becomes the law for similar cases, and is upheld and continued in the future by the doctrine of stare decisis. The acquiring of the ownership of property is always accompanied with the vesting of rights under and pursuant to the then existing law as declared by the supreme court of the state. This

law so declared remains a rule of property until that law shall be changed by the state supreme court overruling or modifying such prior decision, in which case the rule of property would be changed to correspond with the latest utterance of the supreme court upon the subject. This change in the rule of property would only affect transactions occurring subsequent to such change in the decision of the state supreme court. As to all transactions affecting the ownership of devolution of property, occurring prior to such change in the rule, they would be controlled by the rule of property existing at the time of their occurrence. All rights of property must be governed and protected by the laws existing, and as they existed, at the time of the vesting of the right. This principle, so manifestly in accordance with the plainest principles of justice, receives our fullest approval, and will be applied in all cases coming within its scope. It is binding, in proper cases, upon the state as upon the individual. The state has not one law for the citizen, and a different application of it to itself. It has received the sanction of the highest court of the land in many cases * * *.''

Wisconsin Lumber Co. v. State, (1911) 97 Miss. 571, 54 So. 247, involved the validity of state land patents. A group of individuals entered into a conspiracy to secure tax lands from the state in excess of the 240 acres allowed by statute to one individual. This was accomplished by using the names of 96 persons who by prearrangement were to convey to the group when the patents were issued. The state filed suit to set aside the patents as a fraud on the state. The court held that fraud was shown but noted that a similar scheme had previously been before the court and had been held to be devoid of fraud, causing forfeiture. The Court overruled its prior decision, but applied the precedent to the transaction involved, despite the fraud. Speaking through Justice Anderson, this Court said:

"There is no escape from the conclusion that that case is decisive of this, in favor of appellant. The ruling in that case, however, is so manifestly unsound and mischievous in its effect that it is hereby overruled. Nevertheless, as contended for appellant, it was a rule of property, covering the period of the transactions here involved. It is the law of this case * * *."

In State Tax Commission v. Brown, 188 Miss. 483, 193 So. 794, this Court said: "* * * It frequently happens that personal and judicial opinion diverge, and sometimes lie far apart. But a judge should follow the judicial path, and act upon judicial opinion when the law has been settled. Often a judge of the appellate court would decide a case differently from his predecessors, were it a matter of original decision. There should be stability in the law; and if every judge followed his personal opinion, rather than the judicial opinion of his associates and predecessors, there would be no such thing as a settled rule. The public could not safety rely upon the advice of counsel, who must form his opinion upon the decisions of the Court. This Court has given protection to citizens from the effect of overruling cases, holding that transactions had or done under a construction making the act valid at the time it was done continue legal, although afterwards a change of decision was made by the Court. See Wisconsin Lumber Co. v. State, 97 Miss. 571, 54 So. 247; State v. Longino, et al, 109 Miss. 125, 67 So. 902; Ann. Cas. 1916 E, 371."

In Edward Hines Yellow Pine Trustees v. State, 134 Miss. 533, 98 So. 158, this Court applied a rule of property, saying: "We are not here concerned with the correctness of the decision in Hardy v. Hartman, supra, and the rule there applied, whether correct or not, to titles derived through patents issued to the Pearl Improvement and Navigation Company has become a rule of property and will not be now departed from . . ."

I think Peeples v. Boykin established a legal principle. That case examined a state of facts and reached (

legal conclusion. It held that the recorded deed was notice and an ouster of the other cotenants, and that possession for the statutory period vested title. It is not significant whether this might be called a rule of evidence or a rule as to the quantum of proof. Technical distinctions seem to me to be of little importance. The question is whether a legal principle was announced directly governing the ownership, devolution, descent, transfer, or sale of property, or which affect the title and possession thereof.

For thirty years prior to this Court's opinion overruling the Peeples case, this Court said to all persons dealing in property: If you, or your mortgagor, or grantor, have adversely possessed the land for ten years under a recorded deed purporting to vest in the grantee the full title, your title is good, and this is true notwithstanding the possession is by one who is a cotenant of those not signing the deed. Then on November 14, 1954, this Court overruled Peeples v. Boykin, and knocked the foundation from under any and all titles that had become vested prior thereto. The wisdom and justice of applying a rule of property seems plain to me.

"Upon no theory can security be given to contracts and titles, and at the same time progress and improvement be made in jurisprudence, but by shaking off the error of the past, while we uphold contracts and titles acquired while the error prevailed." Hall v. Wells, 54 Miss. 289.

I think the suggestion of error should be sustained and the case affirmed, and that the change of the law brought about by overruling Peeples v. Boykin should not affect any title vested under the principle announced in that case.

LEE, J., dissenting.

On the original decision of this case, I thought that the decree of the trial court should have been affirmed. My views were stated in a dissent at the time.

I did not think Peeples v. Boykin, 132 Miss. 359, 96 So. 177, should have been overruled because in my opinion (1) it was correctly decided and announced a wholesome principle of law; and (2) from long recognition, it had become a rule of property, many titles rested on it, and these should not be disrupted with the probability of great injustice.

I did not see how it would be judicially possible to reverse this case, if Peeples v. Boykin, supra, remained a part of our jurisprudence. However, inasmuch as the other Members of the Court determined to overrule it, I realized the futility of a lengthy exposition of my contrary views; and I strove to save the case on other grounds.

I think the blow of overruling Peeples v. Boykin should be softened at least to the extent of making it prospective; and I therefore join in the dissent by Justice Gillespie against overruling the Suggestion of Error in this case.