Jones, et al. *v.* Jones, et al.

No. 39796 January 9, 1956 84 So. 2d 414

*Fant & Bush*, Holly Springs, for appellants.

*Smith* & *Hurdle,* Holly Springs, for appellees.

KYLE, J.

This case is before us on appeal by Christiana Jones and others, complainants in the court below, from a decree of the Chancery Court of Marshall County dismissing with prejudice the bill of complaint filed by them against Sylvester Jones and Willie Clayton Jones, defendants, seeking to have a trust for their benefit impressed upon two tracts of land now in the possession of

the defendants, which were formerly owned by the complainants and the defendants as tenants in common.

The appellants are the widow and six of the eight surviving children of Henry Buck Jones, deceased, and the appellees are the remaining two surviving children of the deceased.

The record shows that Henry Buck Jones died on June 1, 1921, and that he was the owner at the time of his death of 303 acres of land in Marshall County, Mississippi, described as the NE¼, less 17 acres, of Section 36, Township 4, Range 5 West, containing 143 acres, and the NW¼ of Section 31, Township 4, Range 4 West, containing 160 acres. After the death of Henry Buck Jones, his widow, Christiana Jones, and several of the children continued to live on the land and to carry on the farming operations. But the farming operations were unprofitable, and in time several of the children went to Chicago to live; Christiana placed a mortgage on the land, or her interest therein; the taxes on the land were not paid; and on June 6, 1932, the 143-acre tract described as the NE¼, less 17 acres, of Section 36, was sold to the state for the taxes due and unpaid for the year 1931; and on September 19, 1932, the 160-acre tract described as the NW¼ of Section 31 was likewise sold to the state for delinquent taxes. The lands were not redeemed from the tax sales, and title matured in the state.

In 1936 Dean Belk, an attorney at law, of Holly Springs, procured from all the heirs a warranty deed which purported to convey to him "all right of redemption in and to the said lands." The deed was dated August 25, 1936, and recited a cash consideration of $100, and the grantors in the deed warranted "the right of redemption herein conveyed against the lawful claims of any and all persons whatsoever." The deed was signed and acknowledged by all of the heirs and was filed for record soon thereafter; and on October 3, 1936,

a state forfeited tax land patent was issued to Belk for the sum of $151.50. On October 17, 1936, Belk executed a mortgage deed of trust on the lands to L.D. Tucker as Trustee, to secure the payment of a promissory note for the sum of $526, payable to W. W. Callis and due one year after date, and to secure any other amounts furnished to Sylvester Jones and Willie Clay Jones during the year 1937 and such amount as they owed to Callis for supplies for 1936, not to exceed the sum of $150. On April 15, 1937, Belk conveyed the lands to Callis by a deed of bargain and sale for the sum of $1,515.

Sylvester Jones and Willie Clayton Jones remained on the lands during the years 1937, 1938 and 1939, and paid a money rental therefor to Callis for each of those years; and on December 30, 1939, Callis conveyed the lands to them in two separate parcels for the sum of $1,000 each. The sales were credit sales, and each of the purchasers executed a mortgage deed of trust on the land conveyed to him to secure the payment of a purchase money note for the sum of $890. It was later discovered that the land described in the deed to Sylvester was the land occupied by and intended for Willie Clayton, and that the land described in the deed to Willie Clayton was the land occupied by and intended for Sylvester; and on November 1, 1945, Callis executed correction deeds for the purpose of correcting the descriptions. Each of the two grantees then executed a new mortgage deed of trust to Callis to secure the payment of a promissory note for the sum of $1,225, due one year after date. Sylvester and Willie Clayton also executed quitclaim deeds to each other. On April 6, 1946, Sylvester and his wife conveyed to L. L. Woods 90 acres of the 143-acre tract which Sylvester had purchased from Callis. The purchase price received by Sylvester for the 90-acre tract was $1,460. Callis testified during the hearing before the chancellor that Syl-

vester had paid to him the full amount of the $1,225 note executed by him in 1945; but Willie Clay was still indebted to Callis at the time of the trial.

The bill of complaint in this cause was filed on January 2, 1954. The complainants alleged in their bill that Henry Buck Jones was the owner of the lands at the time of his death, and that after his death the lands were owned by the complainants and the defendants as tenants in common; that Christiana, the widow, continued to reside on the lands and still resided thereon at the time of the filing of the bill of complaint; that about the year 1927 Sylvester and Willie Clayton began to manage the lands for their mother and a fiduciary relationship was created thereby between them and their mother; that it was said that sometime thereafter the lands had been sold to the state for taxes, and during the year 1936 Christiana and the other complainants and the defendants employed Dean Belk, a member of the Bar of Marshall County, to reacquire the title of the lands from the state, and to secure the repayment to him of the costs incurred in redeeming the lands and also compensation for his services, the complainants and the defendants executed an instrument of writing conveying their interest in the lands to him; and that pursuant to that employment Belk had the lands patented to himself by a forfeited tax land patent. The complainants further alleged that the defendants had thereafter conspired to obtain the lands for themselves and thereby defraud the complainants of their rights as cotenants, and to carry out that design had prevailed upon W. W. Callis to purchase the lands from Belk, and that the defendants had then purchased the lands from Callis. The complainants alleged that the title thus acquired by the defendants was acquired for the benefit of all of the cotenants; and the complainants asked that a trust be impressed upon the lands for their benefit and

that the lands be sold for a division of proceeds among the several cotenants.

The defendants in their answer admitted that the lands had been sold to the state for delinquent taxes due and unpaid for the year 1931, but denied that any fiduciary relationship existed between them and their mother at the time of the tax sale. The defendants averred in their answer that the tax sales were valid, and that title matured in the state three years after the dates of the tax sales. The defendants denied that Christiana Jones and the other complainants and the defendants, or any of them, employed Dean Belk to acquire title to the lands from the state, or that the relation of attorney and client ever existed between the said Dean Belk and the complainants and the defendants, or any of them, in respect to the acquisition of the title from the state. The defendants denied that the redemption instrument dated August 25, 1936, was executed by the complainants and the defendants to secure the payment of an attorney's fee or expenses incurred by Belk in obtaining the tax title from the state. The defendants denied that they had conspired to obtain title to the lands for themselves by defrauding their cotenants. The defendants averred that the redemption instrument was executed by the grantors therein for the consideration therein stated and conveyed their entire interest in the lands to the said Dean Belk, and that when Belk acquired the title and interest owned by the state the title to the lands became vested in him irrevocably, and the cotenancy relationship theretofore existing between the complainants and the defendants was thereby finally terminated. The defendants averred that they had rented the lands from Belk and his grantee, Callis, for a period of several years and had later purchased the lands from Callis, and that they had been in possession of the lands claiming the same as their own since that time. The defendants pleaded in bar of the complainants' suit their

actual adverse possession of the lands, under claim of ownership, uninterruptedly continued for more than ten years by occupancy, as provided in Section 711, Code of 1942; and also three years actual occupation under a tax title, as provided in Section 716, Code of 1942; and two years adverse possession under the forfeited tax land patent, as provided in Section 717, Code of 1942.

The case was tried before the chancellor at the regular May 1954 term of the court.

Six of the seven complainants testified during the hearing.

John Henry Jones, who was living in Chicago in 1936, testified that he came to Mississippi during the month of August and learned at that time that the lands had been sold for taxes. He went to Mr. Belk's office and made arrangements with him to redeem the lands "out of the state's hands" and hold the same for expenses until the heirs paid him. Sylvester and Willie Clay were to work the land and pay Mr. Belk, and they agreed to do that. John Henry testified that he employed Mr. Belk as a lawyer, and the heirs were to pay him $250 for his services. The total amount of money to be paid to him was $500. Sylvester and Willie Clay were to have the use of the lands for three years for the payment of $500, and after that they would lose all claim to the lands. John Henry later said that Mr. Belk agreed to give them five years to pay the debt, and after that the lands were to go back to the heirs.

Christiana testified that Mr. Belk said, "Now, boys, let me keep it," and they said, "No, we will keep it, and we will get somebody to buy it," and Mr. Belk said all right. Christiana stated that the agreement among the heirs was for Willie Clay and Sylvester to take the land over and pay the debt, meaning the $500, "and some more debts," and the heirs all agreed that they would let Willie Clay and Sylvester have the land, and they would pay to each of the heirs the sum of $200 for

their interests. Donnie Alexander testified that the heirs agreed for Mr. Belk to get the land back from the state, and that Mr. Belk should be paid the sum of $500, and after five years the land was to fall back to the heirs, and Willie Clay and Sylvester agreed that they would pay each of the heirs $200 for his or her interest in the land after the $500 was paid to Mr. Belk.

Amelia Fant testified that she was present in Mr. Belk's office when the redemption deed was signed. They told her to come and sign to get the land out of the state's hands. She was asked ''Did you hear anything said about who was to pay any money to anybody?'' Her answer was, ''Well, Mr. Dean didn't say nothing about paying for the land, but after we come down stairs I told my brother and them if they wanted my part I would sell it to them, because I didn't think I would ever live back there any more.'' Amelia stated that she did not hear anything said about how the money to redeem the land out of the state was going to be paid. Sarah Raiford testified that the heirs signed the paper to redeem the land and turned the land back over to Willie Clay and Sylvester for five years, and they were to pay the taxes. She did not know how much money they would have to pay, and she did not know whether they agreed to do that or not. She stated that the heirs had an agreement among themselves, however, that Sylvester and Willie Clay were to pay each of the heirs $200, ''but it wasn't in black and white.'' Lillie Bell Jones testified that she signed the paper, when the others signed it, to get the land out of the state. She did not know that Sylvester and Willie Clay were claiming the land until December 1953. On cross-examination, Lillie Bell admitted that she was in Mississippi in 1946 and worked a crop with Oran on the part of the land that Willie Clay had in his possession, and that Oran paid Willie Clay 500 pounds of cotton as rent for that year.

All of the witnesses testified that they read the deed to the right of redemption which they signed in 1936, and that they understood what was in it at the time they signed it.

Willie Clay Jones testified that he was living on the Henry Buck Jones place in a house that he had built himself and paid for. He received a letter from Mr. Belk—got word that the land had been sold to the state for taxes. He went to see Mr. Belk, and Mr. Belk told him that he had the land for himself. He signed the paper which the other members of the family signed in 1936, and he then talked to Mr. Belk about staying on the land after Mr. Belk got it. Mr. Belk wanted his money, and "Mr. Callis bought it from Mr. Dean, was my understanding." Willie Clay stated that he and Sylvester made arrangements with Mr. Callis to stay on the land and pay money rent to him, and after renting the land for several years they purchased the land from Mr. Callis on credit and executed notes and deeds of trust for the purchase price. They had continued to live on the land since that time. Willie Clay stated that his mother stayed there a while, "then she stayed here and yonder." He stated that he had told his mother and his brothers and sisters that he owned the land. He told them that, "when it was first done." They never disputed his ownership until December, 1953. He stated that his mother was staying with Sylvester at the time of the trial. She had a warm comfortable room, which he and Sylvester had built for her. He stated that he had paid the taxes on the land conveyed to him during the last 15 or 16 years. His mother had never claimed any rent from him. He had never agreed to pay his mother, or his brothers and sisters, $200 each for the land. He stated that Oran Jones had made a crop on the land in 1946 and had paid him a 500-pound bale of cotton as rent. Oran did not claim to own any interest in the land at that time.

Sylvester Jones testified that the land got away from the heirs somehow through bad management. Their mother had mortgaged the land to somebody and couldn't pay the debt, and the land was sold for taxes. Mr. Belk got it and had them all to come to his office and sign papers to him. He did not know how Mr. Belk got the land from the state. But the land had gone to the state, "and we signed the paper for him to get it for himself, it was my understanding." Sylvester was asked who got the $100. His answer was, "my mother got it, Christiana." Sylvester stated that after that he went down to Mr. Callis and "went to doing business with him," and Mr. Belk then sold the land to Mr. Callis. He and Willie Clay continued to work the land a couple of years and paid Mr. Callis rent; and after that, Mr. Callis sold part of the land to him and the other part to Willie Clay. Sylvester stated that his mother had married Frank Jones in 1929 or 1930 and had lived with him about a year. She then came back home and stayed one year and then went to Isadore Alexander's. After that she lived "off and on" at different places, but had been living with him about 16 or 17 months at the time of the trial. There had been no discussion about the land since Mr. Callis sold it to him and Willie Clay. Sylvester stated that he worked his part of the land, and Willie Clay worked his part. Oran had made a share crop with him one year and had paid him one half of what he made. Oran then went over to Willie Clay's place and worked a part of Willie Clay's land. Sylvester stated that at the time the heirs signed the redemption deed Mr. Belk said that he was getting the land for himself. Sylvester also stated that he saw Mr. Belk pay his mother the $100 in ten-dollar bills.

W. W. Callis testified that he bought the land from Mr. Belk in April 1937, and paid him a little over $1,500 for the land. He kept the land about three years and rented it to Sylvester and Willie Clay for a cash rental of $150.

He then sold the land to Sylvester and Willie Clay on credit and took deeds of trust on the land to secure the payment of the purchase price. Callis stated that he knew nothing about the sale of the land for taxes and knew nothing about the arrangements made by the heirs with Mr. Belk to buy the land back from the state.

At the conclusion of the evidence the chancellor found that the complainants had failed to establish the allegations of their bill. The chancellor found that, whether the tax sales made to the state in 1932 were valid or not, the deed to the right of redemption which Belk obtained from the heirs in August 1936 and the forfeited tax land patent issued to him by the state constituted color of title, and that the defendants had established their title to the lands by adverse possession for a period of ten years. The chancellor also found that the complainants had been guilty of laches and were estopped by their own deed to Belk and by their silence over such long period of time to claim that the defendants held the lands under a constructive trust for the benefit of all the heirs. And the chancellor ordered that the complainants' bill be dismissed with prejudice.

The appellants' attorneys argue four points as grounds for reversal of the decree of the lower court: (1) That the chancellor erred in holding that the complainants' proof was insufficient to show that the defendants had acquired title to the lands in trust for the benefit of all the heirs of Henry Buck Jones, deceased; (2) that the court erred in holding that the defendants had acquired record title to the lands by deeds of conveyance from Dean Belk and his grantee, W. W. Callis; (3) that the court erred in holding that the defendants had acquired title by adverse possession for a period of more than ten years; and (4) that the court erred in holding that the complainants had been guilty of laches and were estopped to assert their title to the land.

■■ We have made a careful examination of the record, however, and we think that it cannot be said that the chancellor was manifestly wrong in his finding that the complainants' proof was insufficient to show that the defendants had acquired title to the lands in trust for the benefit of all the heirs of Henry Buck Jones, deceased. We also think that there was ample evidence to support the chancellor's finding that the defendants had acquired title to the lands for themselves by purchase and by adverse possession for a period of ten years.

■■ It is not necessary for us to consider at this time the question whether the tax sales of June 6, 1932, and September 19, 1932, were valid or invalid. It is clear from the testimony of all the parties that the complainants and the defendants regarded the tax sales as valid. The warranty deed to the right of redemption which the heirs executed on August 25, 1936, recited that the lands had reverted to the state under a tax sale; and the grantors in that instrument conveyed and warranted to Belk their right of redemption. The deed itself shows that it was the purpose and intention of the grantors to convey to Belk their right of redemption so that Belk might acquire the tax title from the state, and the complainants are not in a position to attack the validity of the tax title under these circumstances.

■■ But whether the tax sales were valid or invalid, the warranty deed to the right of redemption and the forfeited tax land patent issued to Belk on October 3, 1936, constituted color of title. Shepherd v. Cox, 191 Miss. 715, 1 So. 2d 495, 136 A.L.R. 1346; Carney v. Anderson, 214 Miss. 504, 58 So. 2d 13, 38 A.L.R. 2d 981; Henry v. Henderson, 216 Miss. 252, 62 So. 2d 315. ■■ And Belk went into possession of the land under that color of title. The record shows that Belk and those claiming under him remained in possession of the lands and exercised exclusive rights of ownership and control over the lands until the date of the filing of the

bill of complaint in this cause. All of the heirs had actual knowledge of the two instruments which constituted Belk's color of title and the basis of Belk's claim of ownership; and there is ample evidence in the record to support the chancellor's finding that the defendants, who had purchased the lands from Belk's grantee fourteen years before this suit was filed, had acquired title to the lands by adverse possession for a period of ten years, unless the Court should hold that the complainants' proof was sufficient to establish their claim that Belk acquired title to the lands pursuant to an oral agreement with the heirs that he would hold the lands as security for a debt and that he would reconvey the lands to the heirs when the debt was paid, and that the defendants acquired title from Belk's grantee for the benefit of all the heirs.

There was a sharp conflict in the testimony of the witnesses concerning the alleged oral agreement of Belk to reconvey the lands to the heirs upon their payment to him of the sum of $500. John Henry Jones, Christiana Jones and Donnie Alexander and her husband, Isadore Alexander, testified that there was such agreement. Amelia Fant testified, however, that "Mr. Dean didn't say nothing about paying for the land," and she did not hear anything said about how the money to redeem the land out of the state was going to be paid. Sarah Raiford testified that she did not know how much money they would have to pay, and she did not know whether the parties agreed to turn the land back over to Willie Clay and Sylvester or not. Lillie Bell Jones was in Chicago when she signed the redemption deed and apparently knew nothing about the alleged oral agreement. The defendants, Willie Clay Jones and Sylvester Jones, testified that their understanding was that Mr. Belk had acquired title to the land for himself.

The rule is well settled that, "Deeds and written contracts are deemed to express the real intentions

of the parties, until the contrary is established by convincing proof, * * * ■■ ■ and a party alleging that a deed, absolute and unconditional in form, was in effect a mortgage, must meet and overcome the presumption which the law raises from the face of the papers, namely, that the instrument is in legal effect just what it purports to be; * * *. This presumption is strengthened by lapse of time, so that, if a very long period elapses before the grantor sets up his claim that the instrument should be considered as a mortgage, the clearness and weight of the evidence which is required of him will be correspondingly increased." 59 C.J.S. p. 82, Mortgages, par. 48 a.

■■ ■ The complainants' claim that Belk acquired title to the land as security for a debt only finds no support in the actions and conduct of the parties themselves after the execution of the redemption deed. It is clear from the testimony of all the parties that the complainants and the defendants recognized Belk's title to the land, and Belk dealt with the land as his own. Belk executed a mortgage deed of trust on the land to secure an indebtedness owing by him to Callis a few days after receiving the forfeited tax land patent from the state and a deed of conveyance of the land to Callis six months later. Callis purchased the land from Belk for the sum of $1,515 and rented the land to Willie Clay and Sylvester for three years at an annual rental of $150, and then sold the land to them in 1939 in two separate parcels for the sum of $2,000. Willie Clay and Sylvester remained in possession of the land claiming it as their own and exercised all rights of ownership and control over the land for a period of fourteen years after they purchased the land from Callis, and the complainants asserted no claim to the lands until after Belk's death in 1953.

■■ ■ "The fact that the grantor permits the grantee in an absolute deed to assert title to the property and to exercise acts of ownership over it, without setting

up any claim of a right to redeem or to a reconveyance, especially if this continues for a long time, strongly indicates that the conveyance was not intended as a mortgage." 59 C.J.S. p. 81, Mortgages, par. 46.

■■■ The appellants in this case did not charge fraud in the procurement of the redemption deed which they executed to Belk in 1936; and there is no substantial proof in the record to support the charge made by them in their bill of complaint that the appellees conspired together to attempt to obtain the lands for themselves "in defraud of the rights of their cotenants."

In Jordan v. Jordan, 145 Miss. 779, 111 So. 102, this Court said: "When it is sought to destroy the sanctity of an instrument, such as a deed, by parol proof, and change its form from the absolute to the conditional, the proof necessary to alter or change the written instrument must be clear, unequivocal and convincing."

■■■ The proof offered by the appellants to establish their claim that Belk acquired title to the lands in 1936 subject to an oral agreement that he would hold the lands only as security for a debt and that he would reconvey the lands to the heirs when the debt was paid, was neither clear nor convincing; and we think there was no error in the chancellor's finding that the appellants had failed to establish their claim that the appellees acquired title to the lands in trust for all the heirs. We also think there was ample evidence to justify the chancellor's finding that the appellants were estopped by their own deed to Belk and by their silence over such long period of time to claim that the appellees held the lands under a constructive trust for the benefit of all the heirs.

This case is wholly unlike the case of Nichols v. Gaddis & McLaurin, Inc., 222 Miss. 207, 75 So. 2d 625, which is cited by the appellants in their brief, in that the record in this case shows that all of the complainants in this case executed the redemption deed dated August 25,

1936, and all of the complainants had actual knowledge of Belk's acquisition of the state's tax title; whereas, in the case of Nichols v. Gaddis & McLaurin, Inc., the complaining parties had neither signed the deed of trust, which was later foreclosed, nor had notice of the execution of the instrument or the subsequent foreclosure proceedings.

We find no reversible error in the record, and the decree of the lower court is therefore affirmed.

Affirmed.

*McGehee,* C.J., and *Arrington, Ethridge,* and *Gillespie* JJ., concur.