REED et al. *v.* BALES

No. 41747          March 27, 1961          128 So. 2d 374

*Reeves, Brumfield & Reeves,* Magnolia; *Louis Alford,* McComb; *Watkins & Watkins, Breed O. Mounger,* Tyler-town; *R. E. Steen,* Picayune, for appellants.

*B. D. Statham,* Magnolia; *Armstrong & Hoffman,* Hazlehurst, for appellees.

Kyle, J.

This case is before us on appeal by Emma Osby Reed and others, complainants in the court below, from a decree of the Chancery Court of Pike County dismissing with prejudice the original and two amended bills of complaint filed by them against Louis B. Bales and others, defendants in the court below, seeking to establish the complainants' title as heirs at law of Tom Osby, deceased, to certain undivided interests in 120 acres of land in Pike County, Mississippi, described as the N½ of the NE¼ and the SE¼ of the NE¼ of Section 14, Township 4 North, Range 3 East, alleged to have been owned by Tom Osby, the common ancestor of the complainants and certain named defendants, at the time of his death in 1925.

The record shows that Tom Osby, deceased, who was also known as "Tom Ausburn", died intestate on January 5, 1925, and that he left surviving him as his only heirs seven sons, Flowers Osby, Jeff Osby, Henry Osby, Bruce Osby, Tom Osby, Jr., Robert Osby and D. C. Osby, and three daughters, Sisley Osby, Fannie Osby Singleton and Annie Osby, and also one set of grandchildren, being the children of his deceased daughter, Chaney Osby Nelson, who had died in 1918. The record shows that the said Tom Osby owned the 120 acres of land involved in this suit at the time of his death. The record is not clear as to who occupied the property from the date of Tom Osby's death until the date the appellee, Louis B. Bales, entered into possession of the property under and by virtue of a warranty deed from Mrs. E. R. Harlan in the spring of 1936. It does appear, however, that D. C. Osby was living in the log house on the land at the time of the death of his father, and that D. C. was in possession of the land at the time Bales purchased the land from Mrs. Harlan, and that D. C. Osby remained on the land until March 1936 when he moved to another farm a short distance from the 120 acres.

The record shows that the 120 acres of land was assessed to D. C. Osby for taxes for the year 1927, and was sold on April 2, 1928, to D. J. Ferguson for the nonpayment of taxes due for the year 1927; that the land was assessed to D. C. Osby for the year 1928, and was sold on April 1, 1929, to J. J. Cassidy for the nonpayment of taxes due for the year 1928, and that a tax collector's deed was executed to J. J. Cassidy on April 1, 1929. The record also shows that D. C. Osby and his wife executed a deed of trust on the land on February 18, 1928, to secure the payment of certain indebtedness owing by them to Harlan Motor Company, and that, on March 10, 1931, D. C. Osby and his wife executed a warranty deed to Mrs. E. R. Harlan, in which they conveyed to Mrs. Harlan the entire 120 acres. On April 3, 1931, J. J. Cassidy executed a special warranty deed to Mrs. Harlan, conveying to her the 120 acres of land; and on January 6, 1936, Mrs. Harlan conveyed the 120 acres of land to Louis B. Bales by warranty deed purporting to convey the entire estate. A part of the purchase price was paid in cash, and the unpaid balance was secured by a mortgage deed of trust on the land. Both instruments were filed for record a short time after the date of their execution. The record also shows that, on May 16, 1942, Louis B. Bales and his wife executed a mortgage deed of trust on the land to secure the payment of an indebtedness owing by them to McComb Lumber & Coal Company; that during the years 1948 and 1950 Louis B. Bales executed term royalty conveyances to several named grantees, with warranty of title; and that, on March 4, 1950, Louis B. Bales and his wife executed an oil, gas and mineral lease for a primary term of ten years, with warranty of title, to R. W. Brownlee, which said lease was later assigned by Brownlee to Sun Oil Company.

The original bill of complaint in this cause was filed on July 22, 1958. The complainants named in the original bill were Emma Osby Reed, a daughter of the above

named Flowers Osby, who had died intestate on July 10, 1956, Randolph Nelson, R. B. Nelson, Plumentine Nelson Cockerham, Helen Dunlap, Chris Nelson and Walter Nelson, surviving children of the above named Cheney Osby Nelson, deceased, Bruce Osby, Robert Osby and Sisley Osby, surviving children of the said Tom Osby, deceased; Toy C. Curtis and Arnell Curtis, children of Alberta Curtis, deceased, a daughter of Flowers Osby, and Renda Phillips, only child of the above named Jeff Osby, who had died intestate in 1952.

The complainants in their original bill named as parties defendant Louis B. Bales and his wife, Golden Bales, who were alleged to be the owners of the child's share in the estate of Tom Osby, deceased, inherited by D. C. Osby; the Sun Oil Company, the owner of the above mentioned oil, gas and mineral lease executed by Louis B. Bales and his wife, Golden Bales, to R. W. Brownlee on March 4, 1950; and certain other heirs of Tom Osby who had not been named as complainants. The stated purpose of the original bill was to establish the rights of the complainants and the other named heirs of Tom Osby, deceased, as co-owners of the 120 acres of land, and to have the court place them in possession of the land. Special demurrers to the original bill were filed by Louis B. Bales and his wife and the Sun Oil Company, which were sustained by the court, and the complainants on October 29, 1950, filed an amended bill of complaint, in which other heirs of Tom Osby, or their successors in title, were named as parties defendant; and on January 17, 1959, the complainants filed a second amended bill of complaint. Separate answers to the second amended bill of complaint were filed by the defendants, Louis B. Bales and his wife, Golden Bales, and the defendant Sun Oil Company. In their answers the said defendants denied the material allegations of the amended bill of complaint; and as affirmative matters of defense, the defendants alleged in their answers that the said Louis B. Bales and

his wife, Golden Bales, had been in actual, open, visible, notorious, peaceable, continuous and exclusive possession of said land since the year 1936, and had acquired title to said land by adverse possession for a period of more than ten years, and that the complainants were barred of any claim or interest in said land by Sections 709, 710, 711, and 716, of the Mississippi Code of 1942, Rec.

The cause was heard at the Febraury 1960 term of the court, and a final decree was entered dismissing the complainants' original and amended bills of complaint with prejudice.

The chancellor found that no relationship of cotenancy ever existed between the complainants and the defendants, Louis B. Bales and his wife, Golden Bales, in the ownership of the land in question, but if any such relationship ever existed, the possession of the land by Bales and his wife from 1936 to the date of the filing of the bill of complaint in 1958 was sufficient to establish a complete ouster of the complainants and their predecessors in title. The chancellor found that Louis B. Bales and his wife went into possession of the land under a valid deed in the year 1936; that they immediately built an expensive home on the land, which they occupied continuously thereafter; that they planted thousands of tung oil trees on the land and sold timber from the land on numerous occasions, beginning in 1942; that they farmed and cultivated said land, and posted the same against trespassers, drilled water wells, and executed mineral and royalty deeds and oil, gas and mineral leases on said land, retained all income from; that they paid the taxes on the land and obtained their homestead exemptions for approximately 20 years; and that said acts of ownership, together with the long possession, were sufficient to constitute an ouster of the complainants for more than the statutory period. The chancellor found that Bales' claim of ownership of said land was hostile and exclusive against the complainants from the time he and his wife

went into possession in 1936, and that the acts of Bales and his wife, and every circumstance surrounding them in connection with their ownership and occupancy of the land, negatived any idea of a cotenancy relationship with the complainants. The chancellor was of the opinion, and so stated, that the facts in the case were sufficient to show that the complainants had such knowledge as to import to them actual notice that the possession of Bales and his wife, from the beginning, was exclusive and hostile to the claims of all other persons, including the complainants.

The appellants' attorneys assign and argue two points as grounds for reversal of the decree of the lower court: (1) That the chancellor erred in his ruling that there was no tenancy in common between the appellants and the appellees, Louis B. Bales and his wife, Golden Bales; and (2) that the chancellor erred in his holding that the appellees had ousted the appellants.

It seems clear from the record that we have before us, that Mrs. Harlan acquired title to only an undivided 1/11th interest in the 120 acres of land by the deed executed to her by D. C. Osby on March 3, 1931; and that Louis B. Bales acquired title to only an undivided 1/11th interest in the land by virtue of the deed executed to him by Mrs. Harlan on January 6, 1936. As we see it, the sole question presented for our decision on this appeal is whether Bales' possession of the property during the period of more than 20 years, under claim of ownership as set forth above, was sufficient to constitute an ouster. We think that it was.

There is no dispute as to the facts relating to Bales' purchase of the land from Mrs. Harlan in 1936, or as to Bales' exclusive occupancy and control of the property from that date until the date of the filing of the bill of complaint in this cause. Bales, a stranger to the title, had an attorney examine the title before he purchased the property from Mrs. Harlan. Bales went into pos-

session of the property, not as an heir of Tom Osby, deceased, but as grantee in a warranty deed executed by Mrs. Harlan purporting to convey the entire estate in fee; and Bales and his wife occupied the property continuously as a homestead for a period of more than twenty years without any interference or protest on the part of any of the appellees. Bales' possession of the land from its inception was open, notorious and adverse, and uninterrupted by any assertion of claim by others. His possession was exclusive, under color of title, as shown by a recorded deed, and was characterized throughout the entire period by visible acts of ownership so unequivocal that knowledge on the part of the cotenants must be necessarily presumed. Although the record shows that all of the above named appellants, now claiming an interest in the land adverse to Louis B. Bales, or those through whom they claim title, had resided for many years in Pike County, Mississippi, or some other county in Mississippi, it is not claimed that any of them, or any of the other heirs of Tom Osby, asserted any claim to or interest in the land after Bales went into possession under his deed from Mrs. Harlan, until the discovery of the Little Creek Oil Field approximately one year before the filing of the original bill of complaint in this cause.

This Court has held in several cases that, when one tenant in common of land conveys the whole estate in fee, with covenants of seizin and warranty, and the grantee enters and holds exclusive possession thereof, such entry and possession are a disseizin of the cotenant. Iler v. Routh's Heirs (Miss.), 3 How. 276; Eastman Gardiner et al. v. Hinton, 86 Miss. 604, 38 So. 779; Shelby v. Rhodes, et al., 105 Miss. 255, 62 So. 232, Ann. Cas. 1916D 1306; Jones v. Hoover, 204 Miss. 345, 37 So. 2d 490; Ferguson v. Chancellor et al., 206 Miss. 518, 40 So. 2d 275.

In the early case of Iler v. Routh's Heirs, supra, the Court held that one heir may disseize his coheirs as well

as a stranger, and, notwithstanding any entry as heir, such heir may afterwards by disseizin of his coheirs acquire an exclusive possession on which the statute of limitations will run. The Court in its opinion in that case said: "It is unquestionably true, that in general, the entry of one heir will inure to the benefit of all, and that if the entry is made as heir without claim of an exclusive title, will be deemed an entry not adverse to, but in consonance with the rights of the other heirs. But it is as clear that one heir may disseize his coheirs, and hold an adverse possession against them, as well as a stranger, and notwithstanding an entry as heir, the party may afterwards, by disseizin of his coheirs, acquire exclusive possession, on which the statute will run. * * * Jonas Iler claimed the whole estate, and sold it to the appellees, who have held it adversely to all the world, for nearly thirty-five years, keeping all others, during that time, out of possession. This is therefore considered by us to be a clear case for the application of the statute of limitations."

In the case of Eastman Gardiner et al. v. Hinton, supra, the Court held that where the vendee of a tenant in common set up a claim in his own right to the whole tract of land, and held possession open and continuously for more than the statutory period, his possession was adverse, without actual notice to the other tenants in common, such vendee being under no relation to them which imposed on him the obligation of giving notice, either actually or constructively, as a condition precedent to the assertion of a hostile claim. In the case of Shelby v. Rhodes, 105 Miss. 255, 62 So. 232, Ann. Cas. 1916D, 1306, the Court held that the rule which prevents one tenant in common from purchasing an outstanding title to the common property and setting it up against his cotenant, is founded upon the confidential relation which is presumed to exist between them, and has no application where the circumstances surrounding them negative

any such relation, as show they, though in law tenants in common, are not such in fact, and are asserting hostile claims against each other with reference to the common property. In Ferguson v. Chancellor, supra, the Court held that the heir of a common ancestor may disseize his coheirs and hold an adverse possession against them; that, notwithstanding an entry as heir, the party may afterwards, by disseizin of his coheirs, acquire exclusive possession on which the statute will run; and that any act of one joint tenant which is evidence of a claim of exclusive ownership, such as taking all the rents and profits to himself, will constitute a disseizin.

But it is argued on behalf of the appellants that the chancellor erred in his finding that Bales' exclusive and hostile possession of the property under claim of ownership was sufficient to establish title in him by adverse possession, in the absence of clear and convincing evidence that the appellants had actual knowledge, or the equivalent thereof, that Bales and his wife were in exclusive possession of the property claiming it as their own; and the appellants' attorneys cite in support of their contention on that point the cases of Nichols v. Gaddis & McLaurin, Inc., 222 Miss. 207, 75 So. 2d 625; Vanzandt v. Vanzandt, 227 Miss. 133, 85 So. 2d 792; Anderson v. Boyd, 229 Miss. 596, 91 So. 2d 537; Wilder v. Currie, 231 Miss. 461, 95 So. 2d 563 and 97 So. 2d 384. But each of those cases was decided on facts entirely different from the facts shown by the record in this case, and none of those cases in our opinion are controlling here.

In Nichols v. Gaddis & McLaurin, Inc., supra, the record showed that James W. Nichols, the son of J. N. or Jim Nichols, remained in possession of the land owned by his father for a period of 19 years after the foreclosure sale, as a tenant of Gaddis & McLaurin, who had purchased the land at the foreclosure sale. In Vanzandt v. Vanzandt, supra, the record showed that the controversy was

a family controversy between the heirs at law of E. M. Vanzandt, Sr., who died in 1922, leaving a will in which he devised to his wife, for the term of her natural life, 320 acres of land with remainder to his children, share and share alike. J. C. Vanzandt, after his father's death, continued to live with his mother in the home on an 80-acre tract, which was a part of the 320 acres, and cared for her until her death in 1936, and after her death continued to live on the 80-acre tract for a period of 18 years. When finally a suit was filed for a partition of the 320 acres, J. C. Vanzandt claimed that he had acquired title to the 80 acres by adverse possession. The Court held that the proof was insufficient to show an ouster by J. C. of the other cotenants as a result of his continued occupation of the 80-acre tract after his mother's death. In Anderson v. Boyd, supra, the record showed that the land in controversy was relatively wild land, with no improvements on it, and the Court held that the appellees wholly failed to show an ouster of Mrs. Anderson or any adverse possessory title against her.

In Wilder v. Currie, supra, the land in controversy was approximately 20 acres of land located in an undeveloped subdivision in the western part of the City of Hattiesburg. The land was grown up in grass, weeds and bushes, and had no improvements upon it at the time of the trial. The Court held that the burden of proof was on the Curries to show an ouster of their cotenants by proof of notice of their adverse claims or actual knowledge or the equivalent thereof by the Wilders, and that the record failed to reveal any direct or indirect evidence which would support a finding that Mrs. Rawls, who owned a one-eighteenth interest in the land, had notice, actual or constructive thereof, of the Curries adverse claim.

In this case the record shows that Bales' possession of the entire 120 acres of land conveyed to him by Mrs. Harlan was adverse from its inception. None of the heirs of Tom Osby, deceased, lived on the land at

any time after Bales and his wife moved on the land in March 1936, and occupied the same as a homestead. Bales' acts of ownership, as set forth in the findings of the chancellor, represented conduct so unequivocal that knowledge on the part of the cotenants out of possession must be necessarily presumed. Bales' acts were such acts of repudiation of appellants' claim as were equivalent to actual notice to them.

We find no reversible error in the record and the judgment of the lower court is affirmed.

Affirmed.

*Lee, P.J.,* and *Gillespie, McElroy* and *Jones, JJ.,* concur.